[Crim. No. 7920. Second Dist., Div. Three. Jan. 22, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. ALTON KELLER et al., Defendants and Appellants.

Paul Augustine, Jr., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, Woodruff J. Deem, District Attorney, Edwin M. Osborne and Alfred R. Keep, Deputy District Attorneys, for Plaintiff and Respondent.

FILES, J.—Four men, Keller, McGowan, Bullard and Jones, were charged with conspiracy to commit burglary (Pen. Code, §§ 182 and 459) and attempted burglary (Pen. Code, §§ 459 and 664). Both counts relate to an attempted entry of Richard's Men's Clothing Store in Ventura during the early morning of February 7, 1961. Bullard failed to appear for

trial. The other three were tried before a jury which found all three guilty on both counts. Each defendant was sentenced to the state penitentiary on each count, the sentences to run concurrently. All three appealed. Defendant Jones filed no brief and after notice his appeal was dismissed under rule 17(a) of the California Rules of Court.* This opinion concerns only the appeals of Keller and McGowan.

## The Evidence

The evidence which supports the judgment includes the following:

On February 6, 1961, between 3 and 4 p. m., the manager of Richard's Men's Store saw a new pink Cadillac with two Negro occupants drive down the alley behind the store and park in the parking lot. He saw the driver get out, walk around toward the front of the store and disappear from view. Later he saw the same man return by the same route, enter the Cadillac, and drive away. This witness later identified defendant Keller as the driver and defendant McGowan as the passenger.

During this same period of time a salesman working in the front window of Richard's saw a pink Cadillac drive past the store and turn right at the corner, and proceed towards the rear of the store. He later identified McGowan as the passenger in the Cadillac.

At this time Richard's was equipped with a burglar alarm system which included white tapes on the glass of each door. This system had been installed in July 1959, a few days after a burglary there.

About 3 a. m. on February 7, 1961, Ventura police discovered that the aluminum-encased glass rear door to the building adjacent to Richard's had been forced open. The police entered and found Jones and Bullard, wearing stockings on their hands and no stockings on their feet. Nearby the officers found a tire iron which could have been used to pry open the door, and a pick. There were pick marks on the common wall between the vacant store and Richard's.

Jones and Bullard were searched, and in Jones' wallet were found two traffic citations which referred to a 1959 Cadillac, color white over red, with license TAT 161. Jones' address was shown on the citations as 620½ West 41st Place, Los Angeles. A report of the arrest was broadcast on the police radio, with a request to watch for the 1959 Cadillac.

---

*Formerly Rules on Appeal, rule 17(a).

About 3:40 a. m. an officer in a patrol car in Ventura observed two men in a white over pink 1961 Cadillac which had a temporary paper license number on the bumper but no license plate. The officers followed the 1961 Cadillac as it drove slowly around the city. After making several turns this Cadillac proceeded down the street behind Richard's, from which street Richard's and the adjacent building were visible across a parking lot. As Richard's came in view the Cadillac slowed to about 10 miles per hour for about 200 yards while the occupants looked towards the store. The officers then stopped the Cadillac and the occupants identified themselves as Keller and McGowan. McGowan told the officers that they were on their way to San Francisco "to get some girls" and that they were lost. The officers looked in the Cadillac and saw that it contained no luggage, clothing or toilet articles. McGowan and Keller were then taken to the police station where they were questioned further. Both told the officers that they had left Los Angeles sometime between 2 and 3 a. m. Both denied knowing Bullard and Jones. When booked, McGowan and Jones each gave his address as 620½ West 41st Place, Los Angeles. At the police station it was discovered that Jones was carrying a business card of "Blood and T. L. Shine Palor [sic]." It was later established that this was the name of a shoe repair and shoe shine business conducted by Keller (who was known as "Blood") and McGowan (who was known to his friends as "T. L."). On the card in handwriting appeared "AD 12928 T.L." Bullard was also carrying a slip of paper with "AD 12928" upon it. It was later ascertained that AD 1-2928 was the number of a telephone listed as of the date of the arrest to a subscriber by the name of Jane Smith at 620½ West 41st Place, Los Angeles. On April 7, 1961, this telephone was put under the name of T. L. McGowan.

It also appeared that the 1959 Cadillac, license TAT 161, was owned, in February 1961, by a woman who described herself as McGowan's common law wife. She testified that she was acquainted with Jones and had loaned her car to him on many occasions.

Keller and McGowan signed, as indemnitors, the bail bond applications for both Jones and Bullard.

About 4 p. m. on February 7 the police discovered a Ford panel truck on the street about 200 yards from Richard's. The truck belonged to a man named Davis, who testified that on February 1, 1961, he had loaned his truck to McGowan and had not seen it since.

A Los Angeles police officer who knew McGowan and Jones testified that in the latter part of January 1961 he had seen the two men together at 620½ West 41st Place, Los Angeles, at which time McGowan said, referring to Jones, ''The kid's all right. He's a square.''

At approximately 1 p. m. on February 7, 1961, Keller, Mc-Gowan, Jones and Bullard were placed together in a small interrogation room at the police department. The room was approximately six feet wide and seven feet long. The room was equipped with a microphone connected with a loudspeaker and a recording system in an adjoining room. While the four defendants were in the interrogation room the officers in the other room heard and recorded the following statements: ''That damn traffic ticket.'' ''I told them you were driving for a whore.'' ''Did you tell them you knowed me?'' ''Did they impound the truck yet?'' ''It makes no difference now. We are going to court, anyhow.'' ''Don't tell them where you borrowed the truck.'' ''Tell them you come up from Santa Monica to hustle the sailors.'' ''Tell them you planned the job yourself.'' ''What's the matter? Couldn't you make the front door when the heat come in?''

The voice was a whisper and the remainder of the conversation, if any, could not be heard. The voice was partially obscured by pounding and rattling noises which could have been made by the defendants to frustrate eavesdropping. The officers recognized the voice of the speaker as that of McGowan.

The prosecution produced as a witness a man named Gibson, who testified that in 1959 Keller and McGowan had invited him to join them in burglaries of men's clothing stores. Gibson then went on to explain the methods which McGowan taught him. They would drive around the streets looking for a men's clothing store that did not have a burglar alarm. They were to avoid doors on which the tape of an alarm system appeared. They looked for aluminum-framed glass doors. McGowan taught Gibson the technique of forcing such a door with a tire iron. They looked for a store with parking facilities, or a store close enough to a corner so that the merchandise could be carried to a car parked around the corner. The burglars were instructed to remove their socks from their feet and place them on their hands to avoid making fingerprints. They were not to carry gloves or extra stockings because such articles would create suspicion if they were stopped by police. The normal procedure was to take two vehicles, with two persons in each. One car would be driven around the area while the

other was being loaded. The reason was that if the occupants of one vehicle were apprehended, the occupants of the other would escape and would be free to raise money for bail and attorney's fees. If either car was stopped by police, the occupants were to deny knowing anyone in the other vehicle. If the store was a large one, they would obtain a panel truck to carry the loot.

Gibson described in detail five burglaries in which he had participated with Keller and McGowan, following these prescribed procedures. One of these was the burglary of Richard's Men's Clothing Store in Ventura in July 1959, when several hundred suits were taken away in a panel truck.

The prosecution also called a woman named Jackson who testified that she, too, had been invited by Keller and McGowan to join them in the burglary business, and that they had similarly instructed her in their methods. She described four burglaries in which she had participated, using the techniques described above. Both of the witnesses Gibson and Jackson said that Keller and McGowan told them of 75 or 100 burglaries of clothing stores in which they had participated.

Several police officers who had investigated some of the burglaries described by Gibson corroborated some of the details given in Gibson's testimony concerning the methods employed in committing those offenses.

Los Angeles police officer Chapman testified that he had interviewed Keller on November 23, 1959. At that time Keller bragged of the many burglaries he had participated in and reminisced about some of the same ones which had been described in the testimony of the witnesses Gibson and Jackson.

### Admissibility of Statements

Defendants contend that it was error to receive evidence of the whispering which took place when the four accused men were together in the interrogation room at the police department. Defendants argue that no witness saw the speaker, that there is no proof that any defendant heard the speaker, that the return conversation was not disclosed; further, that since the conspiracy was at an end, none of the defendants at that point was bound by the admissions of any other.

The detectives who were listening positively identified the speaker as the defendant McGowan. Furthermore, when the tape was played in the courtroom, the jurors had the opportunity to decide for themselves whether it was McGowan speaking. The jurors could properly infer, if they chose to, that

the others in the room could hear what the microphone picked up. The court admonished the jury as follows:

"Now, this evidence is admissible only as against such a defendant, as you find from the evidence, that actually made such a statement, and it is also admissible only as against the other defendants if you find that under the circumstances they should have made some reply, and, therefore, you consider their failure to reply as being some evidence as against them, and only also if you find that a particular defendant heard this."

The fact that the witness (or the recording machine) heard only part of a conversation does not make inadmissible the portion which was heard. (*People* v. *Dupree,* 156 Cal.App. 2d 60, 68 [319 P.2d 39].) From the nature of the remarks which were heard, the jury was entitled to draw· an inference that the silence of the others indicated consciousness of guilt. The evidence was admissible and its effect properly left to the jury in accordance with the trial court's admonition.

### Admissibility of Other Offenses

Defendants contend that it was prejudicial error for the trial court to receive evidence of the other burglaries. The admissibility of this kind of evidence has been discussed in *People* v. *Albertson,* 23 Cal.2d 550 [145 P.2d 7], *People* v. *Peete,* 28 Cal.2d 306 [169 P.2d 924], and *People* v. *Rosoto,* 58 Cal.2d 304, 330 [23 Cal.Rptr. 779, 373 P.2d 867]. The rule which is applicable here is stated in the *Rosoto* case thus: "In a prosecution for conspiracy evidence of other crimes may be received if it tends to show the existence of a common plan or system of the accused. [Citations.]

"The test of admissibility is whether the offense charged and the other offenses exhibit a common *modus operandi*; whether they do so is primarily a question for the trial court."

The testimony of the witnesses Gibson and Jackson was clearly admissible under this principle. The evidence tended to show a common scheme and a particular *modus operandi* for burglaries of men's clothing stores. This evidence constituted substantial proof that it was not a coincidence that Keller and McGowan were driving in the vicinity of Richard's during the small hours of the morning while Jones and Bullard were attacking the store wall with a pick.

The testimony of Officer Chapman that Keller bragged in

1959 about his extensive career in burglary stands on less firm ground. To the extent that Keller's statement to the officer contained details which corroborated the testimony of Gibson and Jackson concerning activities carried out under Keller's supervision, the conversation was relevant and material and served a legitimate evidentiary purpose. However, much of the statement which the officer attributed to Keller was boastful generalization, serving only to show a criminal disposition and propensity on the defendant's part. It has long been recognized that such evidence, if it has no other purpose, should be excluded because its probative value is outweighed by its prejudicial effect. (See *People* v. *Albertson,* 23 Cal.2d 550, 576 [145 P.2d 7] ; *People* v. *Channell,* 136 Cal. App.2d 99, 109 [288 P.2d 326].) However, in this case, the testimony of the witnesses Gibson and Jackson, which was properly in the record, exposed the defendants as professional criminals who had enjoyed long and successful careers in planning and supervising burglaries. The circumstantial evidence of guilt of the offenses charged in the information was most impressive, and was unrefuted except for McGowan's unlikely story of being lost en route to San Francisco. Keller did not testify at all except to state that he had arranged for some unidentified witnesses to appear, and they had failed to arrive. Upon this record, there is no basis for inferring that the outcome of the trial might have been different if the officer's testimony had not been received, and the error in receiving this evidence is not a ground for reversal. (See *People* v. *Guiterrez,* 152 Cal.App.2d 115 [312 P.2d 291].)

### Procedure in Conferring Immunity

Defendants contend that the district attorney committed prejudicial misconduct in the way he presented the testimony of Mrs. Jackson concerning her participation in the earlier burglaries with the defendants. When Mrs. Jackson was called as a witness she answered a few preliminary questions and then informed the court that she desired to claim her privilege against self-incrimination. The court then appointed a lawyer (who happened to be present in the courtroom) to consult with her and advise her. A recess was taken, during which the district attorney disclosed to the witness and her counsel the questions which he proposed to ask. Counsel for the witness then informed the district attorney that the witness would refuse to answer any of them. There was a conference in chambers, during which the district attorney informed the court

and defense counsel that he would ask a series of leading questions and obtain the refusal of the witness as to each, thereby to lay the foundation for an order conferring immunity and compelling the witness to answer under Penal Code, section 1324.[1] This conference was not reported, but the parties afterwards stipulated that this disclosure had been made in chambers and that counsel for defendants had not expressed any objection at that time.

Thereafter court reconvened, and in the presence of the jury the prosecutor asked the witness 94 leading questions, all pertaining to her past association with the defendants Keller and McGowan. To each question the witness responded, "I refuse to answer." The witness was then withdrawn and the district attorney prepared a written request for an immunity order. The witness was then recalled and informed by the court that she had been granted immunity from any prosecution for the matters covered by these questions, and she was ordered to answer each of them. Thereupon all 94 leading questions were again read to the witness, and to each she gave an affirmative answer.

When the questions were put to Mrs. Jackson for the second time, Keller's attorney objected to the third question "as leading and as immaterial, outside of the scope of what we have already talked out." This objection was overruled. Although all three defendants objected to all of the questions asked Mrs. Jackson on the ground of materiality, neither of

---

[1]Penal Code, section 1324, provides: "In any felony proceeding or in any investigation or proceeding before a grand jury for any felony offense if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby, and if the district attorney of the county in writing requests the superior court in and for that county to order that person to answer the question or produce the evidence, a judge of the superior court shall set a time for hearing and order the person to appear before the court and show cause, if any, why the question should not be answered or the evidence produced, and the court shall order the question answered or the evidence produced unless it finds that to do so would be clearly contrary to the public interest, or could subject the witness to a criminal prosecution in another jurisdiction, and that person shall comply with the order. After complying, and if, but for this section, he would have been privileged to withhold the answer given or the evidence produced by him, that person shall not be prosecuted or subjected to penalty or forfeiture for or on account of any fact or act concerning which, in accordance with the order, he was required to answer or produce evidence. But he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order."

the appellants made any other objection at the trial to the form or manner in which her testimony was elicited.

In this court, counsel for appellants (who was not their attorney at the trial) argues that the procedure employed gave the testimony of Mrs. Jackson undue weight and deprived the defendants of a fair trial. We must agree that it was neither necessary nor desirable to present Mrs. Jackson's testimony in this way. ■ The ceremonial reading of 94 leading questions, followed first by the witness' formal refusal to answer each on the ground of self-incrimination, then the granting of immunity and a repetition of the leading questions, does indeed give to the asserted facts a dramatic emphasis. This procedure is undesirable for the reasons normally applying to leading questions, and more. It is widely assumed, at least by laymen, that the claim of privilege implies that a truthful answer would be incriminating.[2] If on the second reading the witness should give a negative or otherwise non-incriminating answer, the jury might conclude that the witness was inconsistent. Thus the procedure employed in this case gives the prosecution the benefit of a kind of automatic impeachment of its own witness in the event of an unfavorable answer. Even worse, the refusal to answer on the first reading may well convey to some jurors the impression that the facts are as assumed in the question regardless of the answer given on the second reading. To avoid the trap created by having to claim his privilege in the presence of the jury, a witness would be required to exercise the nicest discrimination in choosing between the incriminating and the nonincriminating questions on the first reading—a feat not likely to be attempted.

Where, as here, the district attorney was informed in advance that the witness would stand on her privilege, surely it was possible to have avoided this situation. ■ There is nothing in section 1324 which requires that the refusal of the witness be in the presence of the jury. Moreover, it should rarely be necessary to obtain an immunity order with respect to any great number of questions. Although the statute does refer to a person who "refuses to answer a question," thereby suggesting that the immunity order should be made with

---

[2]It is unnecessary to consider whether in the present state of constitutional doctrine this inference is logically sound or legally permissible. It is enough to note that judicial minds have on occasion drawn such an inference. (See *People* v. *Snyder*, 50 Cal.2d 190 [324 P.2d 1]; *People* v. *Kynette*, 15 Cal.2d 731, 749-751 [104 P.2d 794]; *Nelson* v. *Southern Pacific Co.*, 8 Cal.2d 648, 654 [67 P.2d 682].)

respect to a particular question, the immunity granted will apply to "any fact or act" concerning which the witness was required to answer. Thus as a practical matter, after the witness has been ordered to answer a single question, it is unlikely that he would thereafter claim privilege as to any other questions relating to the same fact or act.

The present case is not one in which the procedure followed appears to have been prejudicial. Nothing in the record suggests that the result would have been different if the court had done otherwise. The judgment therefore should not be reversed on this ground.

### Double Punishment

■■■ The judgments in this case sentence the defendants to the state prison for the offense of conspiracy in violation of section 182 of the Penal Code as charged in count I of the information and the offense of attempted burglary of the second degree in violation of sections 459 and 664, as charged in count II, the terms to run concurrently. These sentences violate the rule against double punishment as set forth in *Neal* v. *State of California*, 55 Cal.2d 11, 18 [9 Cal.Rptr. 607, 357 P.2d 839], and *People* v. *McFarland,* 58 Cal.2d 748, 760 [26 Cal.Rptr. 473, 376 P.2d 449]. As stated in the *McFarland* opinion, "if all the offenses are incident to one objective, the defendant may be punished for any one of them but not for more than one." The *McFarland* case involved convictions of burglary and grand theft, the theft having been the culmination of the illegal entry which constituted the burglary. Although the elements of the two offenses are distinct and conviction of both crimes was proper, the Supreme Court concluded that Penal Code, section 654, prohibited punishment for two offenses in such a situation.

Here the information charges two overt acts in the conspiracy count. The first act is that on February 6, 1961, defendants Keller and McGowan went to the vicinity of Richard's store. The second overt act is that defendants Bullard and Jones broke open the rear door of the store building. The object of the conspiracy, as the evidence shows, was to enter Richard's store by way of the adjacent building and steal the merchandise from the store. The overt acts charged in count I were done to that end, and the attempt charged in count II was an attempt to accomplish this single burglary.

■■ Since the conspiracy was not shown to have any objective apart from that involved in the attempted burglary,

the "one objective" test forbids double punishment. The sentence for the lesser offense (the attempt) must be set aside.

Several decisions antedating *Neal* have squarely held that a person may be punished both for conspiracy and for the substantive offense which is the object of the conspiracy.[3] Those cases rest upon the principle that conspiracy is a separate and distinct offense from the crime which is the object of the conspiracy, and that the double punishment rule does not forbid separate punishment for distinct offenses. Thus in *People* v. *Hoyt,* 20 Cal.2d 306 [125 P.2d 29], at page 317, the court said: "The test is the identity of the offenses as distinguished from the identity of the transactions from which they arise." Although none of the older cases approving double punishment for conspiracy and another offense has been expressly overruled, we cannot reconcile those decisions with the reasoning of the court in *Neal* and *McFarland.* We therefore feel obliged to follow and apply the test so clearly laid down in the most recent cases rather than the holdings of the earlier decisions.

The case of *People* v. *Diaz,* 206 Cal.App.2d 651, 672 [24 Cal.Rptr. 367] is not inconsistent with this decision. Diaz was convicted of sale of narcotics, offering to sell, and conspiracy to sell, and a separate sentence on each count was affirmed on appeal. There the overt act charged in the conspiracy count was the transportation of heroin nine days after the transactions involved in the other two counts. Thus the court could properly find that the conspiracy related to a distinct transaction, having its own objective different from the earlier offer and sale.

*People* v. *Dykes,* 198 Cal.App.2d 75 [17 Cal.Rptr. 564], reached a result contrary to that reached here, but without discussion of the point. Dykes was convicted of grand theft, burglary, and conspiracy. The appellate court declared that sentences for both burglary and grand theft violated the rule against double punishment. The conviction for theft was reversed, but the judgment was affirmed insofar as it sentenced the defendant for both burglary and conspiracy. It apparently was not contended there that additional punishment for conspiracy should have been set aside.

The judgments appealed from are therefore reversed only

---

[3]Some of these cases are: *People* v. *Hoyt,* 20 Cal.2d 306, 317 [125 P.2d 29]; *People* v. *Moore,* 143 Cal.App.2d 333, 340 [299 P.2d 691]; *People* v. *Keene,* 128 Cal.App.2d 520, 529 [275 P.2d 804]; *People* v. *Severino,* 122 Cal.App.2d 172, 184 [264 P.2d 656].

insofar as they impose a sentence for attempted burglary. In all other respects the judgments are affirmed.

Shinn, P. J., and Ford, J., concurred.

The petitions of respondent and of appellants for a hearing by the Supreme Court were denied March 20, 1963.