[Crim. No. 8457.   Second Dist., Div. Three.   May 21, 1963.]

THE  PEOPLE,  Plaintiff  and  Respondent,  v.  ARTHUR
JAMES BANDY et al., Defendants and Appellants.

Frank C. Wood, Jr., for Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Plaintiff and Respondent.

FILES, J.—Defendants Bandy and Holman were charged jointly with uttering two checks in violation of Penal Code, section 476a. In other counts of the same information defendants Bandy and Callahan were charged jointly with uttering two other checks in violation of the same statute. The information charged defendant Bandy with two prior convictions for violations of the same statute, and defendant Callahan with three prior convictions for forgery. All of these priors were admitted to be true before trial. After a jury trial each defendant was found guilty as charged, and each has appealed from the judgment.

Inasmuch as defendants contend that the trial court should have granted their motion for an advised verdict at the

close of the People's case, the evidence produced by the People will be summarized first.

The checks charged in the information were 4 of 44 dishonored checks which were dated between March 12 and March 30, 1959. All of these checks were drawn against an account in the Community Bank on San Fernando Road in Los Angeles. Defendant Bandy stipulated that he had placed the signature, "A. J. Bandy," which appears as that of the maker, on each of these checks. The account was in the name of "Petroleum Engineering Co. Operating & Lease Account," a fictitious firm name adopted by defendant Bandy. The payee of each check was one of the three defendants. The account was opened on July 24, 1958, with a $200 deposit. Only Bandy was authorized to draw on this account. On April 14, 1959, the account was closed by the bank as an unsatisfactory account, there being then an overdraft of $202.38. During the nine months this account was open, more than $300,000 was deposited and withdrawn. Approximately 2,000 checks were drawn upon this account and paid. A deposit was made in this account each day (with rare exceptions) from the day the account was opened until April 1, 1959. Almost all of the checks on this account were for amounts between $100 and $200. The balance in the account never went as high as $5,000, and during the greater part of the time was under $2,000.

The checks were a specially printed form containing a picture of a gushing oil well. The office address of the maker as printed on the checks was 6000 Sunset Boulevard, Hollywood. This is the address of a telephone answering service. There was no office of Petroleum Engineering Company at this address except that of the answering service.

The group of 44 dishonored checks consists of the following:

Nine checks payable to Callahan in amounts from $160 to $165, cashed at the Alpha Beta Market in Covina.

Eight checks payable to Callahan in amounts from $185 to $195, cashed at Sears' Pomona store.

Five checks payable to Callahan in amounts from $180 to $188.50, cashed at the Elliot Liquor Store in La Puente.

Nine checks payable to Holman in amounts from $185 to $195, cashed at Sears' Pomona store.

Five checks payable to Holman in amounts from $175 to $192.50, cashed at Sears' Hollywood store.

Four checks payable to Holman in amounts from $125 to

$130, cashed at Safeway Store 52 on Sunset Boulevard in Hollywood.

Three checks payable to Holman in amounts from $120 to $130, cashed at Safeway Store 32 located at Third and Vermont in Los Angeles.

One check payable to Bandy in the amount of $120, cashed at Safeway Store 52 in Hollywood.

An employee of the Alpha Beta Market in Covina testified that the defendant Callahan had been coming into the market to cash checks from two to five times a week during the six months preceding March 1959. Usually he was accompanied by defendant Holman. The checks were usually in the amount of $150 or more. Mr. Callahan had told the manager of the market that he worked for Petroleum Engineering Company, that he did quite a bit of entertaining, and that he received checks for expenses almost every day. The manager of the market said they would be happy to cash these checks for him. All of the checks had been honored until the two which are involved here. Defendant Callahan received cash both for the $160 check which is the subject of count III of the information and the $163.50 check which is the subject of count IV.

The cashier of the Sears Pomona store testified that the defendant Callahan had been cashing checks there for almost a year and had come in almost daily. Defendant Holman also came in, sometimes alone and sometimes with defendant Callahan. Neither man was a customer, but it was Sears' policy to cash checks as a public service.

It was stipulated that an employee of the Sears Hollywood store would testify that defendant Holman had received cash in the amount of $192.50 for the check which is the subject of count I of the information.

An employee of the Safeway Store at Third and Vermont Avenue testified that defendant Holman had been cashing checks there at least once a week for a period of a year before March 1959. When he presented the $130 check which is the subject of count II of the information, he made no purchase but received the full amount in cash. All of these checks, except the last, were for amounts between $100 and $125.

The owner of the Elliot Liquor Store in La Puente testified that he had been cashing checks for defendant Callahan for several months before March 1959. Callahan cashed three to five checks a week there, most of them for amounts of $180 or $185. Sometimes he made a purchase and sometimes he

did not. He received cash for the full amount of the five checks given to the liquor store which were dishonored. Defendant Holman had accompanied Callahan when each of these five checks was cashed.

A cashier at the Safeway Store on Sunset Boulevard said that defendant Holman had been coming in there for six or seven months prior to March 1959, and had been cashing checks at the rate of two or three a week. This market cashed checks at a special booth, so that the cashier had no way of knowing whether the person presenting the check intended to make a purchase or not. Defendant Bandy had also been cashing checks there at the rate of two or three a week for six or seven months. At first the checks were for smaller amounts, but during the last three months before March 1959 the checks ranged from $120 to $130 in amount.

It was the theory of the prosecution that the defendants had engaged in this extraordinary check-cashing activity over a nine months' period to build up an appearance of reliability to the end that worthless checks for several thousand dollars could be passed in these retail establishments during a few days' time. The bank ledger sheets indicate that this could have been done by redepositing and checking out the same money over and over for a period of many months. There can be no doubt that the four checks described in the information were dishonored. The argument of the defendants is that the proof was insufficient to show that each defendant knew at the time the check was uttered that the funds on deposit were insufficient, and intended to defraud the retail store where it was cashed. ▮▮ Such knowledge and fraudulent intent may be proved circumstantially. (*People* v. *Yrigoyen*, 45 Cal.2d 46, 49 [286 P.2d 1]; *People* v. *Harding*, 171 Cal.App.2d 465, 466 [340 P.2d 656].) ▮▮ Here is a most unusual activity of defendants in cashing several checks daily at retail establishments over a period of many months. Checks were regularly cashed at stores located in Hollywood, Los Angeles, Pomona, Covina and La Puente, although defendants were not making more than minimal purchases at any of them. A jury could readily infer that it was more than happenstance that all of the 44 bad checks were passed through these widely separated but carefully conditioned outlets and not presented directly to the drawee bank. The fact that a "business" which wrote 2,000 checks in a nine months' period had no address on its checks except the address of a telephone answering service is a circumstance worth considering. In

view of the nature of the activities described, it is inferable that the defendants were working together and that they intended to happen what actually did happen when the flood of 44 bad checks appeared. The evidence offered by the People was sufficient to support an inference of guilt. For this reason, it would not have been proper for the trial court to have advised the jury to acquit at the close of the People's case. (Pen. Code, § 1118; *People* v. *Wescott,* 99 Cal.App.2d 711, 714 [222 P.2d 256].)

After the motion had been denied, the defendants put in their evidence over a period of nine trial days. They attempted to show that Petroleum Engineering Company was engaged in acquiring oil leases and drilling for oil. Holman and Callahan said their job was to negotiate with farmers and other landowners for oil leases and options on land, and that they usually closed these transactions for cash. They claimed that the checks which they cashed at the retail stores were drawn for the purpose of reimbursing themselves for the money they paid out and the other expenses incurred on these lease-buying expeditions. Defendant Bandy testified that he was in Las Vegas on business most of the month of March 1959 and sent money in to the bank from there. He said that the reason for making daily deposits throughout the nine-month period was that he feared creditors might attach, and he therefore deposited only enough each day to cover outstanding checks.

Defendant Bandy admitted that no income tax returns had been filed for the years 1958 or 1959. There were no escrows or other written records of the real estate transactions for which 2,000 checks had been written and $300,000 purportedly expended in a nine-month period. Bandy claimed that records of these transactions had been kept at his apartment and had been impounded by the landlord for nonpayment of rent. It serves no purpose here to relate further the elaborate explanations given by defendants covering a thousand pages of transcript in this record, or to describe the huge volume of documents which they placed in evidence.

The credibility of defendants Bandy and Callahan was impeached by proof that Callahan had been convicted three times for forgery and Bandy twice for check offenses and once in the federal court for criminal conspiracy.

Defendants place some stress on the fact that Bandy was in Nevada, that he left signed checks with Callahan and Holman who, it is argued, did not know the state of the account, and

that small deposits continued to be made into the account down to April 1. The jury was, of course, not required to accept defendants' stories at face value, and could reasonably have inferred that these circumstances were part of a carefully planned scheme. Defendants were sophisticated enough to understand that their best device for avoiding punishment would be to create a basis for arguing that they were themselves confused, and that the flood of. bad checks which appeared at the end of March was the result of honest mistakes.

Defendants failed entirely to produce records, documents, or independent witnesses that would surely have been available if the $300,000 had been spent acquiring interests in oil land. There was no testimony that a single one of the 2,000 checks was ever cashed at the bank. Defendant Holman admitted that he went to the bank to make most of the deposits. Defendants failed to offer any credible, innocent explanation for cashing so many checks at retail stores from Hollywood to Pomona when one of them was going to the bank each day to make a deposit. The inherent improbability of defendants' explanations and their inability to present independent corroboration greatly strengthened the inference that their real purpose was what the prosecution charged. Defendants do not here assert that the whole evidence was as a matter of law insufficient to support the jury's verdict of guilt on all counts.

It was eminently proper to receive in evidence the entire group of 44 dishonored checks, all written within a period of 19 days and all cashed in the same manner. The fact that the four checks described in the information were a part of a larger group, all cashed and dishonored under similar circumstances, is circumstantial evidence of defendants' knowledge and intent to defraud. (*People* v. *Bercovitz,* 163 Cal. 636, 639 [126 P. 479, 43 L.R.A. N.S. 667]; *People* v. *Spaise,* 193 Cal.App.2d 294, 298 [14 Cal.Rptr. 167].)

The fact that this evidence discloses that defendants have committed offenses other than those charged in the information is not a ground of objection under these circumstances. (*People* v. *Keller,* 212 Cal.App.2d 210, 216 [27 Cal.Rptr. 805].)

Defendants argue that the trial court erred in permitting the district attorney to proceed on a theory of conspiracy when he had not pleaded conspiracy. This question was recently considered and decided adversely to defendants in *People* v. *Pike,* 58 Cal.2d 70, at page 88 [22 Cal.Rptr. 664,

372 P.2d 656]. No surprise or other unfairness to defendants resulted from the People's election not to add a separate count charging a criminal conspiracy. Defendants must have been well aware before trial that the case against them would be based upon the theory that they had acted jointly.

■ Defendants' final contention is that when the trial judge passed upon the motion for new trial he was of the opinion that the evidence as a whole did not support the verdicts, and therefore was under a duty to order a new trial under the principle discussed in *People* v. *Robarge,* 41 Cal. 2d 628, at page 633 [262 P.2d 14]. In support of this contention defendants point to a statement made by the trial judge concerning a conversation with one of the trial jurors who called on the judge at his home after the trial. At the time of the hearing on the motion for new trial, the judge stated: "I might have even said to him [the juror], and I think that I did, that I felt personally that I would have voted for an acquittal on the facts, had it been before me. . ."

The jury returned its verdict on August 19, 1961. Defendants' motion for new trial, first set for September 11, was continued three times at the request of defendants. It was finally heard and decided on October 16, 1961, after more than three hours of argument and colloquy. At the beginning of the argument the judge disclosed to counsel what he had said to the juror shortly after the trial. He also explained that he had been impressed by the defendants' contention at the trial that they had been engaged in a legitimate business of great complexity but had been somehow unable to produce convincing evidence of it. The judge also reminded defendants that he had granted three continuances of the motion for new trial upon representations of counsel that they would present affidavits showing newly discovered evidence. There followed an extended argument by counsel for defendants, after which the trial court stated: "We are impressed differently by evidence, and I was impressed by all the business transactions involved, but now I must say that I have a different feeling about it. Now I feel that the jury was right because——for the simple reason that had this been a substantial business involv[e]ment, there would have been no problem in bringing affidavits here to show investments into this business and they are unable to produce one affidavit. My feeling is completely reversed. I feel like those 12 jurors did a treme[n]dous job of paying attention which possibly the Court didn't." A little later, he added, "Now I feel strongly

of their guilt.''

Upon this record we cannot say that the trial judge failed to discharge his duty to consider the weight of the evidence and satisfy himself as to its sufficiency within the meaning of the *Robarge* decision. The trial judge was entitled to view the evidence in the light of the arguments presented in connection with the motion for new trial. It was the trial judge's mature view of the weight of the evidence which he held at the time he ruled on the motion, not his view on the day the verdict came in, which properly controlled his decision.

Counsel has informed the court that during the pendency of this appeal, defendant Callahan has died. All proceedings against defendant Callahan, therefore, have abated (*People* v. *Dail,* 22 Cal.2d 642, 659 [140 P.2d 828]) and the superior court is directed to make an order to that effect. As to defendants Bandy and Holman, the judgment is affirmed. The order denying a new trial is not appealable (Pen. Code, § 1466) and hence the appeals from the order are dismissed.

Shinn, P. J., and Ford, J., concurred.

A petition for a rehearing was denied June 7, 1963, and appellants' petition for a hearing by the Supreme Court was denied July 17, 1963.