[Crim. No. 18206. Second Dist., Div. Five. Jan. 14, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES VIRGIL BROWN, Defendant and Appellant.

## Counsel

Edward J. Horowitz, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Schwab, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**KAUS, P. J.**—A jury found defendant guilty of 6 sexual offenses against his 12-year-old stepdaughter S.[1] There is no need to enumerate the various counts or to describe the evidence in detail. Suffice it to say that two counts related to an episode in defendant's car on or about January 1, 1969. The other four arose out of sexual activities at the family home in the afternoon of April 30, 1969,[2] while defendant's wife was at work away from home. S. fully described the offenses. Defendant denied all incidents. Such additional facts as are necessary will be stated in connection with our discussion of defendant's various claims of error.

### I.

Defendant claims that he was prejudiced by "lengthy, repetitive and undue" impeachment of witnesses favorable to the defense, namely defendant's wife and his 10-year-old stepson D. In particular defendant claims error in repetitive questioning concerning statements they retracted when called as witnesses by the People.

The background to this claim is as follows: during the night of May 1, 1969, defendant and his wife had a discussion concerning his going out in the evening. During that discussion defendant made some statement about his relationship with S. Just what he said is much in issue. The next morning defendant's wife questioned S. who admitted intimacies with defendant. Mrs. Brown then reported the matter to the police and gave a statement to the effect that the night before defendant had confessed to "having an

---

[1] At the time of the first charged offense S. was actually twelve years and three months old. According to her mother she was "in fact, a year older than what she is."

[2] The victim was not too certain about the date. She testified that the crimes were committed when defendant came home early. The record shows that during the week in question defendant was serving as a juror on a civil case. On April 30, the jury was released at 3:15 p.m.

affair" with S. This confession was supposedly embellished with statements such as: ". . . I am sure she could eventually handle all of me." At the trial Mrs. Brown claimed that she had lied to the police because she was angry with defendant.

D.'s testimony was relevant to a very narrow issue: S. had testified that on occasions when defendant came home early in the afternoon, he would send D. out of the house. D. had confirmed this in his statement to the police. At the trial he too recanted when called by the prosecution and later, as a defense witness, claimed that S. had put him up to lying to the police.

■ There was no error committed with respect to either witness. We could dispose of any claim respecting the wife by pointing out that extremely able counsel for defendant, who made numerous objections throughout the trial, never claimed that the cross-examination with respect to the inconsistent statements to the police became prejudicially repetitive. To the contrary, it was the court itself which eventually ruled that the impeachment had become "cumulative, that it might be prejudicial" and should not be pursued any further. Defendant, of course, claims that the ruling came too late. Even passing over the lack of a request for it, we disagree.

Mrs. Brown was not very good at distinguishing between what she swore defendant had admitted to her during the night and what she had told the police he had said to her. We have read the entire record. It does not appear to us that the prosecutor spent more time on the subject of her statement to the police than was necessary to obtain a reasonably accurate picture of her trial version of her conversation with defendant and to impeach her with her earlier statement. (Cf. *People* v. *Chacon,* 69 Cal.2d 765, 779 [73 Cal.Rptr. 10, 447 P.2d 106].)[3]

■ The same is true of the examination of. D. In his case defendant complains, in addition, that the prosecution was permitted to ask him questions about his inconsistent statement and to play a tape recording of the statement as well. There was no objection to the playing of the tape. D. had been asked very few questions about his statement to the police and had denied remembering what he had said. Section 770 of the Evidence Code had clearly been satisfied when the tape was played. Later D. testified as a defense witness. It was then that he accused S. of telling him to lie to the police. Naturally the prosecution then became entitled to launch

---

[3]The trial took place before the United States Supreme Court, in *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930] told us that our own Supreme Court, in *People* v. *Johnson,* 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], had construed *Pointer* v. *Texas,* 380 U.S. 400 [13 L.Ed.2d 923, 85 S.Ct. 1065] too strictly. The trial court was at all times most careful to limit the police station version to impeachment purposes.

into a searching cross-examination with respect to that revelation. Again, we find no objection on the basis now asserted. There was no error.

## II.

■ Defendant claims prejudice because the prosecutor, in the jury's presence, moved that the court grant Mrs. Brown immunity under the provisions of section 1324 of the Penal Code. Similar prejudice is claimed to have arisen from the fact that D. was actually granted such immunity while he testified.

To understand the setting in which these incidents arose we have to go back a little further than the allegedly prejudicial motion.

The prosecutor had been examining Mrs. Brown with respect to her statement to the police for some time when he asked her: "Was everything that you told the police department not true?" Defense counsel then made the following statement: "Object, your Honor. At this time ask the Court to admonish the witness she has a constitutional right not to answer and although I am the attorney for her husband, as a friend of the Court with your permission I advise her, your Honor, to not answer unless the Court orders her on the ground any statement might tend to incriminate or degrade her, your Honor." That statement, plus a lengthy discussion which followed, was made right in front of the presumably fascinated jury. Court then adjourned for the day. The next morning there was further discussion on whether or not the court should appoint an attorney for Mrs. Brown—again in front of the jury. Defense counsel freely spoke about the problem. The court eventually decided not to appoint counsel and said that it would advise Mrs. Brown if a question came up. The examination then resumed. A few pages later we read: "Q. Now, Mrs. Brown, these things that you said to the police department, do you recall whether they were the truth or not? [DEFENSE COUNSEL] *Okay.* [Our italics.] THE COURT: Here, Mrs. Brown, I would advise you to exercise your privilege against self incrimination. THE WITNESS: I will stand on the Fifth. THE COURT: Your privilege under the Fifth Amendment is sustained. You don't have to answer the question." It seems pretty clear that defense counsel's "Okay" was a nudge to the court to advise Mrs. Brown of the privilege. A little later, when the prosecutor again asked Mrs. Brown concerning a statement she had given to the police, the court—this time without any defense prodding—advised the witness that she did not have to answer the question. The prosecutor then made the following statement: "Your Honor, the People would ask leave of court—we do have to have the actual writing under the provisions of 1324 of the Penal Code, ask the Court to grant Mrs. Brown immunity from any proceedings that may stem from her testifying to any possible

incriminating statement from questions that I have asked her and for an order from the Court ordering Mrs. Brown to answer." The defense promptly asked for a mistrial. During the argument in chambers which ensued and which resulted in a denial of the motion, the court refused to grant immunity to the witness, because before any question concerning the Fifth Amendment had come up, she had already admitted that she had told some lies to the police.

We believe that under the circumstances the issue is a storm in a teacup. To be sure matters of this nature should not be thrashed out in the presence of the jury, since one can never be sure just what kind of inference it may draw from proceedings such as took place here.

The defendant now argues that the offer of immunity must have convinced the jury that Mrs. Brown had been lying in that part of her testimony which was favorable to defendant. He relies on *People* v. *Keller,* 212 Cal. App.2d 210, 219-220 [27 Cal.Rptr. 805].

While we are in thorough agreement with *Keller,* which says—as we just did—that situations such as we have described should be avoided in the jury's presence, the case is not otherwise in point. There the prosecutor had asked a witness many leading questions, the answers to which would have been favorable to the prosecution, as well as incriminatory as far as the witness was concerned. As the prosecutor knew she would do, she claimed her privilege against self-incrimination. Immunity was then conferred and she answered the questions. The reasons the court gave for criticizing the procedure were these: ". . . It is widely assumed, at least by laymen, that the claim of privilege implies that a truthful answer would be incriminating. . . . If on the second reading the witness should give a negative or otherwise nonincriminating answer, the jury might conclude that the witness was inconsistent. Thus the procedure employed in this case gives the prosecution the benefit of a kind of automatic impeachment of its own witness in the event of an unfavorable answer. Even worse, the refusal to answer on the first reading may well convey to some jurors the impression that the facts are as assumed in the question regardless of the answer given on the second reading. To avoid the trap created by having to claim his privilege in the presence of the jury, a witness would be required to exercise the nicest discrimination in choosing between the incriminating and the nonincriminating questions on the first reading—a feat not likely to be attempted." (*People* v. *Keller, supra,* 212 Cal.App.2d at p. 219.) The court then proceeded to affirm the judgment, because the witness' answers were consistent with the inference from the claim of privilege possibly drawn by the jury.

In this case, as noted, the court did not grant immunity because the

witness had already testified in an incriminatory manner, namely that she had violated section 148.5 of the Penal Code, relating to false reports to law enforcement officers. Had the immunity been granted we would have precisely the same situation as was found not to be prejudicial in *Keller*. We appreciate that some jurors may not have analyzed the situation as a lawyer would and thus understood that it was of benefit to the defense, even if not to Mrs. Brown, that she had lied to the police. In some muddled fashion they may have interpreted the prosecutor's remark as further affecting her credibility as a witness. It seems clear, however, if that is what the jury did, defense counsel is more to blame than the court and the prosecutor, for it was he who first raised Fifth Amendment problems in front of the jury. The prosecution merely abided by what appeared to be the ground rules laid down by the defense.

## III.

■ Similar problems are raised with respect to the testimony of D. Soon after he had testified to a lack of memory concerning what he told to the police, the prosecutor started to question him concerning specific statements. A hearsay objection was overruled and the jury instructed to consider any answer only for the limited purpose of impeachment. The court then called counsel into chambers and pointed out that it would be unnecessary to lay any foundation for the admission of extrinsic evidence of a statement inconsistent with D.'s testimony. (Evid. Code, § 770.) The prosecutor stated that he wanted to probe whether D.'s testimony had been "influenced by his home situation."[4] The court then said: "Well, I don't want to restrict you. I wanted to say if you asked him a question about whether or not he told a different story to the police I am going to tell him not to answer it to protect his Fifth Amendment privilege. Of course he can't be convicted of a crime but he could—" Defense counsel made no objection to this proposed course of conduct but instead finished the court's last sentence as follows: ". . . end up in juvenile hall someplace." Back in front of the jury the court told D. that from time to time it might advise him not to answer certain questions. Defense counsel then started an inconclusive discussion concerning the advisability of appointing counsel for D. About 10 pages of transcript later defense counsel asked the court to instruct D. not to answer a certain question on Fifth Amendment grounds. The court told defense counsel that he should do it, because counsel knew more about the case than the court and the court could not see how an answer to that particular question could incriminate the boy. Later the court did instruct D. not to answer the question whether he had lied to the

---

[4]At the time of trial defendant, his wife and D. were living in the same household. S. was staying with grandparents.

police. D. complied, was granted immunity, but was thereafter merely asked whether he had told the truth from the witness stand. The defense never objected to any of these proceedings taking place in the presence of the jury.[5] On appeal it is again claimed that all of this somehow resulted in an instruction to the jury that D. was not to be believed as a witness. We answer that contention in much the same way as we answered the same argument in the case of Mrs. Brown: although much of what happened could have taken place out of the presence of the jury, there were no objections and it is hard to see how what did happen reflected on D.'s veracity as a witness, as distinguished from his credibility as a police informant. Of course both he and his mother left the witness stand more than slightly tarnished; that, however, was not a consequence of the Fifth Amendment antics, but of the inconsistency between the police station and courtroom versions of their stories. If there was any error, it was harmless beyond a reasonable doubt.

## IV.

The prosecution, of course, tried to show that D. had changed stories between the time he talked to the police and the time he testified, because influenced to do so by the defendant with whom he lived. D. admitted that at some time he may have been afraid of defendant, but he could not remember any specific instance. The prosecutor then asked whether D. remembered "any particular time one night" when Mr. and Mrs. Brown were outside the house, D., S., and Kimberly, their half sister inside, and Mr. Brown asked them to move into another room. D. said that he was asleep at the time. When asked what night he was talking about, he answered, defensively: "Whatever night you are talking about." After establishing that defendant had firearms in the house, the prosecutor asked for a conference in chambers. There he made plain the purpose of his inquiry and proved his good faith by stating that on a certain night during the preceding February, defendant, during a fight with Mrs. Brown, had fired a shot in the air at a time when the children had been moved into another room in the house. Criminal charges which had resulted from the event, had been dismissed.[6] Defense counsel amiably suggested that the

---

[5]We note, for the sake of completeness, that when Mrs. Brown was later called as a defense witness, defense counsel at least twice successfully claimed the privilege against self-incrimination for her.

[6]The incident is referred to at some length in the probation report. There the portion of the incident to which the prosecutor referred is summarized somewhat differently: "After the defendant's arrest police interviewed [S.], the defendant's step-daughter, who stated that her step-father had told her that if they heard any noise that she was to grab her little sister and go into her brother's bedroom, turn off the lights, and hid. [Sic.] She stated that after this she heard her step-father loading his gun. She stated that she then heard him go outside and then heard a shot. . . ." We do not deem the discrepancy of sufficient moment to affect the prosecutor's good faith in asking his questions.

prosecutor's problem could be solved by just asking D. whether he was afraid of defendant. The court felt that in view of the fact that somebody had committed serious perjury in the case the prosecutor had the right to ask specific questions "that go to bias and motive and the relationship of the parties." He was permitted to proceed. All that he eventually brought out was that there had been a time when D. awoke and was informed that during the night defendant had shot a gopher.

■ We see no error in permitting the testimony. Fear of reprisals by defendant might have been a powerful motive to lie. (Evid. Code, § 780, subd. (f); cf. *People* v. *Pierce,* 269 Cal.App.2d 193, 203 [75 Cal.Rptr. 257].) The trial court made a carefully reasoned ruling why it felt that under the circumstances of this particular case the probative value outweighed any possible prejudice resulting from evidence that defendant had firearms in the house. Nothing concerning the incident as related in the probation report was heard by the jury. (Evid. Code, § 352.)

## V.

When called as a defense witness, Mrs. Brown depicted S. as a "troubled child," who resented discipline, hated defendant, lacked veracity and was well informed in matters of sex. She also asserted that her home life had been "very nice" since S. had left, following defendant's arrest. The clear implication of her testimony was that any previous troubles were S.'s fault.

On cross-examination Mrs. Brown evidently realized that it would be bad for the defense if the jury got the impression that her personal relationship with defendant had not been "very nice" while S. was in the house. She spoke of him warmly as a lover and belittled his nocturnal absences from the home and other possible faults. In fact her home had started to become happier four years earlier.

At that point the following exchange occurred: "Q. Now, Mrs. Brown, let's take the night of, let's take the night of May 2nd or early morning hours of May 2nd. Your husband on that morning said, did he not, 'I am going to let you have it in the head one of these days out in the boondocks'? A. No. Q. Did he say this? A. I said that. Q. You said that to your husband? A. No. That is what I stated to the police. Q. Just a moment. Before he said that he said, 'I am not going to use the guns tonight,' didn't he? MR. DRAKE: Object, your Honor. Completely beyond the scope of direct examination. I think we are entering a new field, completely beyond the scope of direct examination. I don't think it goes to prove any issue in the case. THE COURT: The objection is overruled. Q. BY MR. CORNWELL: He said he wasn't going to use the guns tonight, didn't he? A. I said that."

█ This incident is assigned as error because it constituted evidence of "prior criminal acts . . . unrelated to the charges" against defendant.

One simple answer is that this was not the basis for the belated objection below.[7] Another is that no evidence of defendant's threat was related to the jury.[8] A third, that even if the threat had been made, it would not have been a crime. (*People* v. *Yslas,* 27 Cal. 630, 633.) We find no error.

It might be noted that the prosecutor showed remarkable restraint in not using the incident of the previous February for some purpose. (See fn. 6, *ante.*) He started to at one point but thought better of it.[9]

## VI.

█ We finally reach the most serious question on this appeal. In addition to describing the acts for which defendant was convicted, S. was permitted to relate to the jury a sordid story to the effect that she and defendant had regularly engaged in various sexual practices for a period of about a year. Defendant claims that the admission of this evidence violated the rule of *People* v. *Stanley,* 67 Cal.2d 812 [63 Cal.Rptr. 825, 433 P.2d 913], to the effect that where the uncorroborated testimony of the victim of the sex act with which the defendant is charged is supported by the same victim's equally uncorroborated testimony concerning other offenses, the prejudicial effect outweighs the probative value as a matter of law.

The People claim that the *Stanley* rule is inapplicable because the record contains corroboration for both the charged and uncharged offenses. They point to the following evidence: 1. There was medical testimony that a vaginal examination of S. conducted May 3, 1969, disclosed a laceration or tear of her hymenal ring. It also showed a moderate inflammation of the introitus. These findings were consistent with the application of an adult penis, but were not conclusive. 2. There was testimony that during the year before the charge was made to the police, blood had been found on S.'s underwear athough she had not yet started to menstruate. According to the doctor who testified, this indicated sexual play of some kind.[10]

---

[7]Appellate counsel wisely does not pursue the claim that the examination went beyond the scope of the direct.

[8]The court had already repeatedly instructed the jury concerning the limited effect of self-contradiction by a witness. It also covered the subject in its final instructions. No specific request for any such limitation was made at the time of the incident.

[9]"And back in February of this year, your husband in the presence of your children —strike that question."

[10]For what it is worth, we may add that S.'s testimony to the effect that there were many occasions when D. was not in the home during the afternoon when she and defendant engaged in sex acts, was strongly corroborated by one of D.'s playmates and the latter's babysitter. This testimony may have been particularly effective in view of D.'s stout denials of ever having been shut out of the house at that time of the day.

We do not believe that these two items are the kind of corroboration visualized in *Stanley*. The oldest in the line of cases which culminated in *Stanley* is *People* v. *Haugh,* 90 Cal.App. 354, 356-357 [265 P. 891] where the court had said: ". . . None of the prior acts testified to by the prosecutrix were corroborated in any manner. The doctor who was supposed to give the corroborating testimony did not testify that the condition which he found was probably the result of sexual intercourse. *There was nothing in his testimony that would tend to show any act of the defendant* and, although this is apparently relied on to show corroboration of the prior acts, there is nothing in such testimony found in the record which would substantiate any such claim. . . ." (Italics added.)

We do, however, find corroboration pointing to defendant in his conversation with Mrs. Brown during the night of May 1, 1969. Before detailing the evidence concerning the conversation, we believe that on the question whether it corroborates S.'s testimony, we may properly take into account not only what Mrs. Brown, as a witness, conceded but also what she told the police but denied at the trial. At a retrial her entire statement would be admissible under section 1235 of the Evidence Code, held constitutional in *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].[11] It would be farcical to reverse because certain evidence should not have been admitted, knowing all the time that at a retrial it will be admissible. Defendant's extremely able appellate counsel reminds us that in *People* v. *Cuevas,* 250 Cal.App.2d 901, 909 [59 Cal.Rptr. 6], we declined to uphold a finding as to a prior conviction based on a court record inadequately authenticated under the law in effect at the time of trial, despite the fact that at a retrial the authentication would have been presumptively adequate under the more liberal auspices of the Evidence Code. We held that we could not assume that at a retrial the defendant would be unable to rebut the presumption. No such problem is present here. Mrs. Brown has never denied what she told the police—the only question was whether it was true. Yet the admissibility of her statement to the police would not depend on whether she reaffirms it at any retrial.

Without, however, attempting to weaken our holding that we may consider all evidence which would be admissible at a retrial, we do point out that even if we disregard the retracted portions of Mrs. Brown's statement to the police, there is probably enough corroboration of S.'s testimony connecting defendant to her sexually. The details are set forth in the footnote.[12]

---

[11]Actually, Mrs. Brown's entire statement was never read to the jury. At a retrial it would probably be presented as one coherent interrogation. The present record merely presents several questions and answers concerning isolated parts of the police station version.

[12]Statements by defendant admitted by Mrs. Brown at the trial: In response to an accusation of "being out all hours of the night fooling around in bars" defendant

There is one further aspect which we should point out. We do not have to decide whether, in the absence of the corroboration contained in the record, it would in itself be sufficient to take the case out of the *Stanley* rule. It is this: as one reads S.'s account of the events on the occasions charged in the information, one cannot help being impressed by one thing: the complete lack of protest, hesitation, refusal, outcry or resistance on her part. She readily removed her clothes, permitted defendant to touch and fondle her intimately, cooperated in assuming positions one of which she herself described as "weird" and, on April 30, readily performed an act of fellatio—a practice which a young girl might deem revolting. The testimony gains credibility, however, when supplemented with S.'s further evidence that the first time defendant asked her to perform the act, she had refused, but had eventually consented on July 4, 1968.[13]

In spite of her ready docility on April 30, S. concededly disliked defend-

replied: "Yes, about as much fooling around as what I have been doing with your daughter." While that statement sounds more like a *reductio ad absurdem* of Mrs. Brown's accusation, a little later she testified simply: "Well he said he had been fooling around with her. I just sort of sluffed it off because I didn't believe him, really." Defendant then said: "You don't believe me" and challenged her to wake up S. to find out.

Statements by defendant denied by Mrs. Brown at the trial but reported to police: 1. "What would you say, what would you do, if I told you I had more or less been having intercourse with [S]?" 2. When Mrs. Brown told defendant that he must have been kidding, he said "You want me to get her up and wake her up and I will go in her bedroom, get her up." 3. A statement by defendant that while S. was still a little bit young and too small, with a little bit of time and work he was sure she could eventually handle all of him. In addition Mrs. Brown told the police that defendant told her that S. was "pretty wonderful." It is not clear from the record whether she conceded that admission at the trial. The interrogation went as follows: "Do you recall what statement you made? Do you recall now what statement your husband made that night? A. Not word for word, no. Q. Does that refresh your recollection? A. No, other than that is what I said, 'You have got to be kidding,' something like that because— Q. With regard to what he said can you tell us what it was that he said about [S]? A. Was that she was supposed to be pretty wonderful, I guess is that what you are referring to in the statement here? . . . Q. Well, did your husband indicate to you that he had been having, more or less having intercourse with [S]? A. Well, that is what he was referring to, yes, that he was having an affair with her. Q. Did your husband ask you that if you did not believe him that he would go get her up, wake her up and ask her so you could ascertain whether it was true or not? A. Yes. I wished he had now, then we wouldn't be here with all of this baloney."

Finally, the record shows these rather inconclusive questions and answers: "Q. Do you recall that your husband said that night, 'Don't sell her short, she can give me a lot of fulfillment that you can't any longer'? A. No. Q. You don't recall that he said that? A. Huh-uh."

[13]The record contains only two instances of any reluctance on the charged occasions: 1. On January 1, 1969, before the episode in the family car, S. had expressed a desire that defendant take her home; and 2. on April 30, 1969, she did not want defendant to insert his penis into her vagina. Defendant had tried to do so on previous occasions but had never achieved full penetration. When he did penetrate partially, it hurt.

ant.[14] Unless the prosecution could show that by his previous conduct, defendant had cowed her into submission, her version of that day's events simply defies belief.

` Thus unless the events of January 1 and April 30 are viewed in the context of a longstanding affair, in which modesty and protest are things of the past, they have an unreal and self-contradictory quality about them. Testimony confined to those dates would have depicted S. as an accuser who obviously knew a great many things about sexual behavior from somewhere, but applied that knowledge unrealistically to two fictitious encounters with a hated stepfather.[15]

██ Since we have concluded that *People* v. *Stanley* was no obstacle to the admissibility of the evidence of uncharged sex acts with S., they were admissible under the general exception which allows evidence of uncharged sex offenses with the same victim to show a lewd disposition towards that victim. (*People* v. *Sylvia,* 54 Cal.2d 115, 119-120 [4 Cal.Rptr. 509, 351 P.2d 781].)

The judgment is affirmed.

Stephens, J., and Aiso, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 9, 1971.

---

[14]The defense, of course, relied on S.'s dislike of defendant to discredit her.

[15]Further, there is the matter of S.'s failure to report the events to her mother until confronted by a demand to know on the morning of May 2. She explained this by testifying that "at the start when he started doing all this to me" he had told her that there were "things you don't tell nobody, not even your mother." While this explanation for this failure was not given until the redirect examination, it would inevitably have revealed at least the general outline of her story concerning a longstanding relationship between herself and defendant.