[Crim. No. 6112. Fifth Dist. May 1, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
CURLY JONES, Defendant and Appellant.

**[Opinion certified for partial publication.[1]]**

---

[1]Parts II and IV are not published as they do not meet the standards for publication contained in rule 976(b), California Rules of Court.

154

162

Counsel

Eric L. Henrikson, under appointment by the Court of Appeal, and Henrikson & Gee for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Charles P. Just and Nancy Sweet, Deputy Attorneys General, for Plaintiff and Respondent.

Opinion

GALLAGHER, J.*—A jury found appellant guilty of rape by threat of great bodily injury as charged in counts one, three, five, nine, twelve, thirteen, fourteen, sixteen and eighteen. The jury found appellant guilty of the lesser included offense of unlawful sexual intercourse in violation of section 261.5 in counts seven, eight and nineteen. Appellant was acquitted on charges of lewd and lascivious acts with a child as charged in counts two, four, fifteen and seventeen. Counts six, ten and eleven had been dismissed and were not submitted to the jury for consideration.

Appellant was sentenced to a term in state prison of 57 years, 4 months. Appellant appeals the judgment of conviction.

STATEMENT OF THE FACTS

Although appellant never actually married Gwen W., he had been living with her for approximately nine years. Also living in the home were Gwen's children: Rachel, Lisa, Lucienda, Glenaia, Charles and Curtis. Tracy, Angela and Robert were friends of Gwen's children.

Rachel, Lisa, Lucienda, Charles, Tracy, Angela and Robert each testified at trial regarding numerous and seemingly continuous acts of sexual abuse

---

*Assigned by the Chairperson of the Judicial Council.

perpetrated against these children by the appellant occurring over the course of a nine-year period. Due to the length of the record, the specific testimony of the children will be discussed in detail as necessary in the subsequent analysis of the individual counts which have been challenged by this appeal.

Appellant had, for a period of time, owned a van containing two chairs and a couch. According to the testimony of the minor victims, it was this van, parked in various locations, in which the sexual acts commonly occurred.

*The Defense*

Appellant was 48 years old at the time of trial. He had worked for 15 years as a heavy equipment operator for Crippin Demolition. He denied ever having sexual intercourse with any of the young women who testified against him. He claimed that none of the charges made by the young women were true. He felt the girls wanted him out of the way because he disciplined them. He acknowledged that he used "switches" pulled from a tree in the yard when disciplining the children. He also felt the charges could be part of a game. Further, appellant testified that although he purchased a van in 1979, it was repossessed in October of 1980. He did not have a van from October 1980 to the time of his arrest, February 9, 1981.

Appellant offered several defense witnesses to impeach the credibility of the victims and to testify to appellant's good character. A defense psychiatrist, Dr. Trevor Glenn, who had examined appellant, was permitted to testify that in his opinion appellant had no mental disorder or defect which might predispose or lead him to commit sex offenses against young girls.

The defense primarily concentrated on discrediting the victims' testimony by showing repeated inconsistencies of details in their testimony, and explaining some or all of the charges by way of fabrication, vindictiveness, and rejection of appellant's efforts at discipline.

DISCUSSION

I. THE EVIDENCE IS SUFFICIENT TO SUSTAIN THE CONVICTIONS OF COUNTS ONE, THREE, FIVE, SEVEN, NINE, THIRTEEN, AND NINETEEN.[2]

Prior to the 1980 amendment, section 261, subdivision 3 defined rape as "an act of sexual intercourse accomplished with a person not the spouse of the perpetrator . . . 3 Where a person is prevented from resisting by threats

---

[2]See footnote 1.

of great and immediate bodily harm, accompanied by apparent power of execution . . . ."

In order to prove the commission of the crime of rape, each of the following elements must be proved: 1. That a person engaged in an act of intercourse with a female, 2. that the female was not his wife, 3. that she did not consent to such act of intercourse, and 4. that she submitted to such act because of a threat of great and immediate bodily harm. (CALJIC No. 10.01 (1979 rev.).)

In asserting that the evidence is insufficient on the enumerated counts, appellant proposes the court must resolve the issue in light of the *entire record* quoting from *People* v. *Johnson* (1980) 26 Cal.3d 557, 576-578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].

Appellant's position would require the court's viewing the record as a whole in order to facilitate a determination that when the inconsistencies in the victims' testimony brought out on cross-examination are considered together with the impeachment of their credibility by defense witnesses, the facts supporting the convictions become insubstantial.

The California Supreme Court has consistently affirmed the appropriate standard of review to be applied by an appellate court when a challenge is made to the sufficiency of the evidence in a criminal case. In *People* v. *Samuel* (1981) 29 Cal.3d 489 [174 Cal.Rptr. 684, 629 P.2d 485], the Supreme Court stated: "Our power to weigh the evidence is of course limited by due deference to the trier of fact, and we must therefore view the record in the light most favorable to the verdict. [Citations omitted.] 'But the jury's discretion is not absolute,' particularly in this context. [Citation omitted.] The verdict must be supported by *substantial evidence*—that is, evidence ' "reasonable in nature, credible, and of solid value; it must actually be 'substantial' proof of the essentials which the law requires in a particular case." ' " [Citations omitted.] (*Id.*, at p. 505.)

In *Jackson* v. *Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781], the United States Supreme Court "announced a new, constitutionally mandated rule for review of the sufficiency of the evidence supporting a state criminal conviction challenged in a federal habeas corpus proceeding." (*People* v. *Johnson, supra,* 26 Cal.3d 557, 576.) The California Supreme Court took the opportunity in *People* v. *Johnson, supra,* 26 Cal.3d 557 to restate the California standard to demonstrate that it complies with federal constitutional requirements as announced in *Jackson* v. *Virginia.*

In *People* v. *Johnson, supra,* 26 Cal.3d 557, having initially stated that: "Evidence, to be 'substantial' must be 'of ponderable legal significance

. . . reasonable in nature, credible, and of solid value.'" (*id.,* at p. 576), the court went on to state: "In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations omitted.] The court does not, however, limit its review to the evidence favorable to the respondent. As *People* v. *Bassett,* [1968] 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777], explained, 'our task . . . is twofold. First, we must resolve the issue in the light of the *whole record*—i.e., the entire picture of the defendant put before the jury—and may not limit our appraisal to isolated bits of evidence selected by the respondent. Second, we must judge whether the evidence of each of the essential elements . . . is *substantial*; it is not enough for the respondent simply to point to "some" evidence supporting the finding, for "Not every surface conflict of evidence remains substantial in light of other facts."' (69 Cal.2d at page 138.) (Fn. omitted.)" (*People* v. *Johnson, supra,* 26 Cal.3d 557, 576-577.) (Italics in original.)

In *Jackson* v. *Virginia, supra,* 443 U.S. 307, the United States Supreme Court stated: ". . . [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . [is] to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." (*Id.,* at p. 318 [61 L.Ed.2d at p. 573].) ". . . [T]his inquiry does not require a court to 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation omitted.] Instead the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Id.,* at pp. 318-319 [61 L.Ed.2d at pp. 573-574].)

Although the test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact, and not whether the evidence shows to the reviewing court that guilt was established beyond a reasonable doubt, the evidence must do more than merely raise a strong suspicion of the appellant's guilt. "Evidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility and this is not a sufficient basis for an inference of fact." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

With this understanding of the appropriate legal standard to be applied, we can now focus on the individual counts challenged by this appeal.

*Lucienda (Count One)*

Count one charged appellant with a violation of section 261, subdivision (3), alleging appellant, on or about November 8, 1980, did wilfully and unlawfully have and accomplish an act of sexual intercourse with Lucienda, not his wife, where she was prevented from resisting by threats of great bodily harm accompanied by apparent power of execution.

■ Appellant contends that the "last act of intercourse" allegedly occurring in November of 1980 actually occurred with Tracy rather than Lucienda, and Lucienda retracted the accusation on cross-examination. Appellant also contends that there was insufficient evidence of the threat element relative to count one.

Lucienda was 12 years old at the time she testified. Her date of birth is November 2, 1968. She became sexually involved with appellant at the age of six. She had sex with appellant shortly after her 12th birthday, i.e., mid-November 1980, while her mother was at a movie theatre. Appellant instructed Lucienda to go into her brother's room. Appellant entered after her and shut the door. Appellant took his pants off and pushed her onto the couch. She tried to push him away but he used his strength against her and held her hands. He warned her that if she told her mother he would "get" her. She interpreted that to mean she would get a "whipping."

When Lucienda was six years old, she fell asleep on the couch and appellant woke her up. He began touching her chest and vagina. He attempted to penetrate her vagina with his penis but she began to "holler." Appellant then began hitting and slapping her.

Appellant only hit her when she was six years old. However, she told him "a lot of times" that she "didn't want to do that" but he would respond that "It ain't nothing" and that it "won't hurt" but it did hurt.

On appellant's birthday, June 15, 1978, when Lucienda was nine years old, appellant asked Lucienda if she had a birthday present for him. She told him that she did not. That evening appellant went to her bed. Lucienda awoke and resisted but appellant "pulled her down" and had sex with her.

Lucienda testified that the last time appellant had any type of sexual contact with her was in Bakersfield, just prior to his arrest in February 1981. However, she later clarified the sexual activity in Bakersfield did not include sexual intercourse.

Lucienda testified the last time she had sexual intercourse with appellant was in mid-November 1980, shortly after her 12th birthday. On direct ex-

amination she testified the incident occurred in her brothers' room. Lucienda was impeached by evidence indicating she told the police and testified at the preliminary hearing that the incident had occurred in her own room, rather than in the boys' room. However, on the witness stand, Lucienda denied telling the police that it occurred in her room. She was further impeached by information she had given to one Dr. Tonnemakher, a physician at Valley Medical Center who examined her on February 9, 1981. She reported at that time a sexual assault at a drive-in movie theatre in November of 1980. She reported no previous or other history of sexual activity. She also testified that in November of 1980 she had sex with appellant in the brown van at a drive-in movie.

Appellant contends that this testimony is inconsistent. However, the record does not establish that appellant had sex with Lucienda on only one occasion in November of 1980. Lucienda testified that sometimes she had sex with appellant "one day every week" although "not always." Other times he would go for months without having any sex with her. Therefore, this apparent inconsistency is not necessarily an inconsistency. Lucienda simply testified she had sex with the appellant at their home and the drive-in during November of 1980.

It is clear that Lucienda became easily confused and her testimony was contradictory upon cross-examination. However, the witness was only 12 years old. She alleged that she had been sexually involved with appellant since the age of six, and there had been many instances of sexual intercourse. It would be surprising if a defense attorney, skilled in the art of cross-examination (as was defense counsel in this case), could not hopelessly confuse an already traumatized 12-year-old child under these circumstances.

 " 'Although an appellate court will not uphold a judgment or verdict based upon evidence inherently improbable, testimony which merely discloses unusual circumstances does not come within that category. [Citation.] To warrant the rejection of these statements given by a witness who has been believed by a trial court, there must exist either a physical impossibility that they are true, or their falsity must be apparent without resorting to inferences or deductions. [Citations.] Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or the jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.]' " (Citations omitted.) (*People* v. *Thornton* (1974) 11 Cal.3d 738, 754 [114 Cal.Rptr. 467, 523 P.2d 267], disapproved on other grounds, *People* v. *Flannel* (1979) 25 Cal.3d 668, 684 [160 Cal.Rptr. 84, 603 P.2d 1].)

■ The jury, who personally observed the witness under the very circumstances of direct and cross-examination, believed her testimony on direct examination and rejected any inconsistencies that surfaced on cross-examination.

■ Appellant also complains the record lacks testimony of force or any threat to Lucienda on the November incident. She testified that the only time appellant ever struck her was at age six. She did testify that appellant threatened that he would "get" her if she told about what had occurred, which she interpreted to mean appellant would give her a "whipping." She also testified that when she attempted to push appellant away, appellant would "put his strength on [her]" and hold her hands. Appellant testified he used "switches" pulled from a tree in the yard when disciplining the children.

In *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], the Supreme Court opined that "by defining rape in categories in which one category is accomplished by the use of force and violence, and the second category is accomplished by the use of 'threats of great and immediate bodily harm,' the Legislature indicated an intent that rape by force or violence was *not* synonymous with rape by means of threat of great and immediate bodily harm," and the latter was intended to be "something more than, and different from" the former. (*Id.*, at p. 583.)

In *Caudillo*, the Supreme Court determined the evidence was insufficient to establish that a burglary victim suffered "great bodily injury" within the meaning of the enhancement of punishment provisions of section 461, where, although the victim was raped, sodomized and forced to orally copulate defendant, she did not suffer physical injury beyond the "bodily harm" inherent in those acts themselves, where she did not testify that she suffered any pain resulting from such acts, where the cuts she suffered from defendant's knife were superficial, and where her injuries constituted transitory and short-lived bodily distress. *Caudillo*, of course, discusses "great bodily injury" in terms of the enhancement statutes. The question in that case was whether the victim actually sustained "great bodily injury" as that term is used in section 461. (*Id.*, at pp. 575-576.) The court held that the Legislature did not intend to equate the concept of "great bodily injury" with the commission, *in and of itself*, of the crime of rape. (*Id.*, at pp. 575-587.) The court was not defining the conduct which constitutes a "*threat* of great bodily injury," which is the problem currently before this court.

A threat may be implied. It may be expressed by acts and conduct as well as by words. (*People* v. *Flores* (1944) 62 Cal.App.2d 700, 703 [145 P.2d 318]; *People* v. *La Salle* (1980) 103 Cal.App.3d 139, 148-149 [162

Cal.Rptr. 816]; *People* v. *Hunt* (1977) 72 Cal.App.3d 190, 194 [139 Cal.Rptr. 675].) "In the typical case . . . the implication of threat is fairly clear, based upon normal response to overt conduct. 'If one were met in a lonely place by four big men and told to hold up his hands or to do anything else, he would be doing the reasonable thing if he obeyed, even if he did not say what they would do to him if he refused.' [Citation omitted.] The language in *People* v. *Hunt, supra,* to the effect that the woman's fear must have a 'reasonable basis in the overt actions of the alleged rapist' (*id.,* at p. 200), is presumably premised upon that typical situation." (*People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 465-466 [161 Cal.Rptr. 634].)

In *People* v. *St. Andrew, supra,* 101 Cal.App.3d 450, a hospital attendant was prosecuted for rape by threat pursuant to section 261, subdivision (3), and forcible oral copulation pursuant to section 288a. The alleged victim was a mental patient at the hospital where the defendant was employed. The victim testified that defendant had said nothing of a threatening nature but that she voiced no protest and did not resist, fearing that defendant would physically harm her or have her restrained and placed in a locked room alone with him. The First District Court of Appeal categorized this as an "atypical situation, involving uncommunicated fears which were possibly not 'reasonable' when tested by normal standards." (*Id.,* at p. 466.) The court concluded that: "If a hospital attendant takes advantage of his relationship with a female mental patient to have sexual intercourse with her under circumstances in which he *knows* that she views his conduct as implying threat of great and immediate bodily harm accompanied by apparent power of execution, and she submits without resistance on that account, he is guilty of the crime of rape even though her view of his conduct may be 'unreasonable' in terms of general standards. Of course, his knowledge may be inferred from all the circumstances of the case. [Citation omitted.] The jury should be instructed in accordance with the foregoing, and its attention should also be called to the requirement that the threats be of 'great and immediate bodily harm.' " (*Ibid.,* fns. omitted.)

█ We interpret the rule formulated in *St. Andrew* regarding assault on particularly vulnerable victims to extend to a consideration of the age, education, and mental faculties of each victim. In a case such as this we look to the long term duration of the sexual involvement and particularly the position of trust, dominance and authority held by the perpetrator, as well as the perceptions of a child in deciding what conduct constitutes a "threat of immediate great bodily harm."

█ "The prevailing rule in California is that threats may be inferred from conduct [citations], and that the victim need only make such resistance as will reasonably manifest her refusal to consent to the act. [Citations.]

While generally the woman has the power to determine for herself the extent to which she feels she can safely resist [citation], her conduct must always be measured against the degree of force manifested and each case must be resolved on all of the circumstances present." (Citations omitted.) (*People v. Hunt, supra,* 72 Cal.App.3d 190, 194.)

". . . [W]here the defendant's conduct is confined to the use of threats, section 261, subdivision 3, is explicit in requiring a threat of immediate *great bodily harm.*" (*Id.,* at p. 195; italics in original.) In *Hunt,* the evidence was held legally sufficient to support the defendant's conviction of rape by threats of great bodily harm where, although defendant uttered no specific threats and the woman apparently consented to the acts, defendant ignored the woman's plea not to be driven into the hills to the place where the acts occurred, and the jury who saw the witnesses and observed their demeanor could reasonably conclude that the fear to which the woman testified was genuine and that defendant's conduct carried an implied threat that the woman had only the choice of submitting or suffering great bodily harm.

In *People* v. *Cassandras* (1948) 83 Cal.App.2d 272 [188 P.2d 546],[3] the court found sufficient threats to justify the victim's lack of resistance, and upheld a rape conviction when defendant took the victim to a hotel on a pretext of obtaining employment for her, and when she was reluctant to enter the room, pushed her, telling her she was not going to get out until she undressed and went to bed with him. The victim in that case testified that she was scared he would hurt her and that she did not care about being hurt, but wanted to get home with her children. The court held that the evidence was reasonably susceptible of the interpretation that threats to do great bodily harm were made, and that the consent of the victim was secured as a result of such threats. The court made the observation that " ' ' "[t]he courts no longer follow the primitive rule that there must be resistance to the utmost." [Citation.] . . . "The resistance required in each case depends upon the circumstances of that case, such as the relative strength of the parties, the uselessness of resistance, the degree of force manifested and other factors. The resistance of the prosecutrix need only be such as to make nonconsent and actual resistance reasonably manifest." ' ' " (*Id.,* at p. 278.)

The above-quoted language in *Cassandras* was relied upon in *People* v. *La Salle, supra,* 103 Cal.App.3d 139, 148-149. In *La Salle,* the court held the evidence sufficient where the prosecutrix saw her daughter's legs protruding from the passenger window of defendant's car and the defendant

---

[3]*Cassandras* was disapproved on other grounds in *People* v. *Collins* (1960) 54 Cal.2d 57, 60 [4 Cal.Rptr. 158, 351 P.2d 326].

was helping the child into the car. When the mother walked over to the car, defendant said, "If you want her, you have to get in the car with me." The victim complied. The defendant put his hand on the victim's leg and tried to pull her over to his side of the car; he told her that her child would "have to go"; he grabbed hold of her wrists when he put her into the back seat of the car and kept a tight grip on her wrists while demanding that she have sex with him. The victim indicated that she did not cry out or fight back because she was afraid that if she did so defendant would hurt her and then she would be unable to get to her daughter. The court found this sufficient evidence of a violation of section 261, subdivision (3). (*Ibid.*)

The instant case presents circumstances not typically present in a prosecution for a violation of section 261, subdivision (3). The facts suggest appellant satisfied his sexual desires by sexually abusing Lucienda and the other minor victims over a long period of time commencing when the children were very young through the use of force and intimidation. When the man who is supposedly the child's prime protector is also her seducer and exploiter, she has no options. (Rush, The Best Kept Secret: Sexual Abuse of Children (1980) pp. 8-9.) The child's silence is based on some very real fears. If she tells, as one woman explained, "Daddy said he would punish me. He never said exactly how he would do that, but I believed him." (Butler, Conspiracy of Silence, The Trauma of Incest (1978) p. 32.) Other women who have been child victims confirm this fear of punishment, not only by the fathers, but also by their mothers, their schools and the police. "Although the nature of the punishment was unclear to them, most of the girls . . . clearly sensed that the weight of the adult world's wrath and the blame would fall solely on them for having been so 'bad.'" (*Ibid.*)

"Weapons are rarely used with children. In a study [performed by Groth and Bernbaum] of 175 males convicted of child sexual assaults, [it was] found in half the cases that the predominant method of engaging the victim in the sex act was through intimidation or threat. This meant physically overpowering the child or threatening to harm her if the victim resisted. The next most frequent approach (30 percent of the cases) was through seduction/enticement where the victims were bribed, tricked, or pressured into sex through rewards and/or reassurances that the behavior would not be harmful to the child. Only 20 percent of the cases involved a brutal attack on the victims with specific intent to hurt them." (Geiser, Hidden Victims, The Sexual Abuse of Children (1979).) "With the child's *natural submission to the authority of the parent,* the incestual situation is one in which the father can count on being in control. . . . The child may continue to submit with resignation since she can do nothing to prevent the incest." (*Id.,* at p. 52; italics added.)

"The effect of sexual child abuse is prolonged and traumatic. It appears that when the relationship continues for a long time, for several years, the emotional damage to the child is greater. Another factor that influences the long-term consequences of incest is the age of the child at the time of the incestuous relationship." (Justice, The Broken Taboo, Sex in the Family (1979) p. 181.) "One of the long-term consequences experienced by the daughter from an incestuous family is that she often develops sexual problems and has difficulty in relating to men in a satisfying way. . . . This confusion between affection and sex may show up in sexual dysfunction or promiscuity." (Id., at p. 184.)

Lucienda's testimony clearly indicates a common and subtle reaction to the sexual exploitation, i.e., that of "passive resistance," of being "pervasively coerced," and participation in the pattern of sexual involvement with appellant through a conditioned process, conditioned by early and repeated threatened and actual punishment by appellant. (See Deaton and Sandlin, *Sexual Victimology Within the Home: A Treatment Approach* (1980) Victimology, at pp. 311-312.) Lucienda's young age together with the position of authority held by appellant for a period of nine years, the uselessness of resistance, the deeply imbedded and conditioned fear of punishment and retribution which commenced when Lucienda was six years old, and the natural submission to the authority of the parent contributed to Lucienda's vulnerability and her perception of appellant's conduct as an implied threat of immediate great bodily harm were she to resist.

Taking into account all of the circumstances present, as required by *Hunt,* Lucienda's conduct manifested the greatest effort she could reasonably be expected to exhibit in protest considering the degree and type of force being applied to her by the appellant.

*Lucienda (Count Three).*

Count three charges appellant with a violation of section 261, subdivision 3 allegedly occurring on or about June 15, 1978, with Lucienda.

Lucienda testified that she had sexual intercourse with appellant on his birthday, June 15, 1978, when she was nine years old. On that day appellant asked her if she had a birthday present for him. She did not. Appellant came into her bed and woke her up. She raised herself up but appellant pulled her back down and had sex with her.

There was no testimony of the use of threats on that particular occasion and, on cross-examination, she testified that on June 15, 1978, she had sex in the appellant's room, i.e., the boys' room, rather than her own.

It is clear that by appellant's continuing course of conduct, forcing Lucienda to have sexual intercourse even though it hurt and threatening to "get" her if she told her mother, appellant compelled Lucienda into participating in sexual intercourse by playing on her fear, a fear produced by appellant's ongoing use of intimidation tactics and previous use of force. (See *People* v. *Reyes* (1984) 153 Cal.App.3d 803, — [200 Cal.Rptr. 651].)

As stated previously, California law provides that threats may be inferred from conduct, and that the victim need only make such resistance as will reasonably manifest her refusal to consent to the act. (*People* v. *Hunt, supra*, 72 Cal.App.3d 190, 194.) In reviewing all of the circumstances present, i.e., the victim being of tender age, the position of authority held by the appellant, the ongoing and continuous exploitation of a resisting and defenseless Lucienda, we find substantial evidence to support the finding that Lucienda submitted to the act of sexual intercourse on June 15, 1978, because of a threat of great and immediate bodily harm.

*Lisa (Counts Five and Seven)*

Count five of the information charges Curly Jones with a violation of section 261, subdivision 3 occurring on or about June 15, 1977, with Lisa. Count seven charged appellant with a violation of section 261, subdivision 3 perpetrated against Lisa on or about June 15, 1979. The jury found appellant guilty of count five as charged and found appellant had violated section 261.5 as to count seven.

Lisa was 16 years old at the time of trial. Her mother is Gwen W., her sisters are Rachel, Lucienda and Glenaia. Charles and Curtis are her brothers. Appellant lived with Lisa's family although Gwen W. never actually married him. At the time of trial Lisa had been pregnant twice, and bore one child in 1981, fathered by Robert. Lisa testified that appellant was the father of a fetus lost due to a miscarriage in July of 1980 during the fifth month of pregnancy. Lisa further testified that she had been having sexual intercourse with the appellant since she was nine years old. Prior to that time the sexual activity with appellant consisted of "touching" and fondling her breasts. Lisa defined sexual intercourse as the insertion of the penis into the vagina.

She claimed to have had sexual intercourse with appellant on occasions too numerous to count. The last occurrence was in November of 1980, sometime before Thanksgiving. They had performed sex in the car, in parking lots, in the driveway, at the drive-in theatre, in a motel, and in the country. At the age of eight, Lisa was told by the appellant that this was "part of life that [she] had to live with." Appellant warned her that if she

told her mother, he would try to kill her. If she refused his advances, which she had done on many previous occasions, she either got hit, slapped, or compelled to have sex anyway.

Lisa testified appellant told her that if she told her mother, that he would try to kill her. She told her grandmother and her mother in the last part of 1979, but her mother did not believe her. She did not tell the police or other officials because she was frightened.

Lisa also testified that appellant forced her to have sex with Robert in a motel in Bakersfield, California. He also forced her to have sex with Freddie H. (hereinafter Freddie) when she was 12 years old. She testified that sex with the appellant was a means of getting something special. Sex was her only way of getting things.

She testified that appellant's birthday was June 15. Appellant informed Lisa that she did not have to get him a present for his birthday, that "sex would do just fine." She testified that she had sex with appellant on his birthday in 1977, 1978, 1979, and 1980. She could not recall any details of the 1977 or 1979 incidents.

 Appellant challenges whether there is substantial evidence to support these convictions on the basis that there is no testimony of a threat or force used on these occasions, much less of a threat of great bodily injury.

Here, again, we look to appellant's continuing course of conduct which began when Lisa was a young child and the particular vulnerability of Lisa under the totality of the circumstances to affirm the convictions under counts five and seven. She was hit, slapped and otherwise compelled to have sex with this man repeatedly during the past seven years. It was abundantly clear to Lisa that resistance was not only useless but would risk the use of physical violence by appellant to subdue her. Lisa, as a victim, cannot be required to ignore all of these experiences when, on a given day, such as his birthdays, appellant "requests" sex.

 As to count seven, if there was any doubt as to whether penetration occurred, defense counsel could have pursued that question further. (*People v. Walls* (1978) 85 Cal.App.3d 447, 455 [149 Cal.Rptr. 460].) Lisa had differentiated between sexual intercourse and sexual touching. Thus, Lisa's testimony that she had sex with appellant on his birthday in 1977 and 1979 is sufficient evidence that an act of sexual intercourse took place on those dates.

*Rachel (Counts Nine and Thirteen)*

 Appellant challenges the evidence in support of counts nine and thirteen which allege rape by threat of great and immediate bodily injury of Rachel W. on June 15, 1980, and July 4, 1980, respectively.

Rachel W. was 15 years old at the time of trial. She had given birth to two children by the time of trial in 1981, neither of which was fathered by the appellant. She testified that she first had sexual intercourse with appellant at the age of six, two months after meeting him. She had sexual intercourse with appellant on many occasions. This generally occurred once every two weeks. However, at the preliminary hearing she testified of sexual intercourse with appellant every three to four days.

She defined sexual intercourse as insertion of the penis into the vagina. She testified that if she resisted, appellant hit her in the face with his hand. She also testified that if she refused to cooperate, appellant would threaten "if you don't, I will fix you," and subsequently appellant would give her a "whipping." Furthermore, she was frightened because appellant had a gun in his room and had threatened her with it a couple of times. He said that if she ever told, he would kill her in her sleep.

Rachel also testified that she had sex with appellant a week before his arrest at the Sunset Drive-in Theatre where they watched "naked movies." The incident occurred in the back of appellant's van. He slapped her, hit her with his fists and sex followed immediately thereafter.

As to the incident which occurred on June 15, 1980, Rachel testified as follows:

"Q. Did he have sex with you on his birthday last year?

"A. Yes, he did.

"Q. Now, what do you remember happening that day?

"A. Him having sexual intercourse.

"Q. Where did he do it?

"A. At the house.

"Q. And how did he ask you to have sex with him?

"A. Give me something for my birhtday [*sic*].

"Q. And did you consent to doing that, giving him something?

"A. Hm-hm (negative response).

"Q. And what happened?

"A. I told him no.

"Q. What happened after you told him no?

"A. Uh-huh, and I fix you, and the next thing I knew, I was getting a whipping.

"Q. Did he hit you that day?

"A. No.

"Q. What do you mean you were getting whipped?

"A. A few days after he did, 'cause he make up an excuse to my mother that I had did something wrong.

"Q. So, he didn't whip you on his birthday?

"A. No, he didn't."

■■■■ Appellant contends that this testimony against "the backdrop of Rachel's constantly shifting testimony and demonstrable pattern of false or inaccurate charges," is not of sufficient weight, substance or believability to sustain a conviction.

However, in the above-quoted testimony, Rachel clearly alleges having had sexual intercourse on appellant's birthday, June 15, 1980. She testified that she resisted him and was apparently punished for that resistance. That testimony is not necessarily inconsistent. The whipping she received from the appellant might have been directed simply to her resisting his advances and his reassertion of a dominant role in the relationship and reinforcing the desired "conditioned response." In viewing the evidence in a light most favorable to the respondent, there is substantial evidence to support the conclusion of the trier of fact as to count nine when viewed in the totality of the circumstances presented. (*People* v. *Samuel, supra*, 29 Cal.3d 489, 505.)

As to count thirteen, Rachel testified that on July 4, 1980, the family went on a picnic at Roeding Park in Fresno, California. After the picnic they went skating together with some friends of Rachel's at "Circle K." It was in the parking lot of the skating rink that she had sex with appellant in the van. On cross-examination, Rachel testified the picnic took place at Kearney Park. At approximately 6 p.m. they returned home to change clothing. They were going to go skating but instead went to watch the fireworks.

Appellant complains that Rachel's testimony on the events of July 4, 1980, "disavows" the charge of rape occurring at the rollerskating rink.

However, Rachel never disavowed on cross-examination that appellant had intercourse with her on July 4, 1980, she merely stated that they had not gone skating but went to the fireworks instead. Confusion and conflicting testimony regarding where they went on the evening of July 4 does not justify overturning the judgment as to count thirteen. Rachel's *consistent* testimony was that she had intercourse with appellant after a July 4 picnic in 1980.

Rachel testified that she had sex with appellant every two weeks. She remembered they had intercourse on the 4th of July because the family went on a picnic. She also testified that she had sex with appellant in the van at the skating rink quite often. She admitted to being confused on the stand.

Here again, the witness was 15 years old. She alleged that she had sexual intercourse frequently with the appellant since she was age six. Her testimony on the witness stand spanned three days. A defense attorney skilled in the art of cross-examination succeeded in bringing out contradictory testimony. However, Rachel testified that on July 4, 1980, she had sexual intercourse with appellant in his van. She remembered the date because of the family picnic. Therefore, there is sufficient substantial evidence of a credible nature to support the conviction. (*People* v. *Samuels, supra,* 29 Cal.3d 489, 505.)

*Angela (Count Nineteen)*

Count nineteen charges appellant with a violation of section 261, subdivision 3 occurring on or about the month of April 1980, with Angela.

Angela was born on June 11, 1965. She was a friend of Lisa, Rachel and Lucienda. She had known appellant since she was nine years old and had been sexually involved with him since the age of twelve. The first sexual intercourse with appellant occurred at the age of 13. The last occasion she

had sexual intercourse with appellant was sometime before Christmas of 1980. Angela was on her way to school, waiting at the bus stop when appellant offered her a ride. Since she was already late for school she accepted appellant's offer. Instead of driving her to school he drove her to a house belonging to one of his relatives. Appellant was talking about painting it. They went into an upstairs bedroom where appellant had sexual intercourse with Angela.[4] She testified that she informed appellant that she did not want to have sex, but she could not leave because she was frightened of what he might do. She was frightened that he would pull a gun on her.

Angela had sex with appellant at the drive-in, at his house, at Shopper's Center, K-Mart, and Zodys on various occasions. Although he had not threatened her at the house, he had threatened her before were she to say anything.

■■■■ Appellant contends there is no specific evidence of an incident occurring in April of 1980, as charged in count nineteen.

Angela recalled one incident in 1980 when appellant drove Angela and Lisa to a rollerskating rink known as Roller Towne. She testified she had sex with the appellant, after he first had sex with Lisa, inside his van. She could not recall the month or day of the occurrence, only that it occurred in 1980 at a time when she was living on Clayton Street. She testified that she lived on Clayton Street from May of 1979 through July of 1980.

Angela also testified to an incident which occurred "sometime during the middle of the school year in 1980" at which time appellant had intercourse with her in the van while at a drive-in movie theatre. She testified the weather was cold and windy on that occasion.

Angela testified to being confused about the specific threats she received from Mr. Jones because her mother's boyfriend threatened her also. She was sure that both of them had threatened her.

In closing argument prior to jury instruction in the case, the prosecutor argued the Roller Towne incident as the incident charged in count nineteen of the information.

In reference to count nineteen, the jury was instructed as follows: "Defendant is charged in Count 19 of the Information with the commission of

---

[4]A reasonable inference which may be drawn from this testimony is that appellant was showing her the house and the upstairs bedroom on the pretext of discussing the painting of the house which he intended to do.

the crime of Rape, a violation of Section 261 of the Penal Code, on or about a period of time between April 1, 1980 to April 30, 1980.

"In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of a specific act constituting said crime within the period alleged.

"And, in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act constituting said crime within the period alleged.

"It is not necessary that the particular act . . . committed so agreed upon be stated in the verdict."

 Due process of law requires that an accused be advised of the charges against him in order that he may have a reasonable opportunity to prepare and present his defense. (*In re Hess* (1955) 45 Cal.2d 171, 175 [288 P.2d 5].) Furthermore, ". . . where there are multiple acts placed before a jury, each being a separate similar chargeable offense in itself, the prosecution must elect the act on which the charge will stand," or otherwise "the jurors [might] range over the evidence at will and pick out any one of the offenses upon which to found its verdict." (*People* v. *Creighton* (1976) 57 Cal.App.3d 314, 318 [129 Cal.Rptr. 249], disapproved on other grounds in *People* v. *Thomas* (1978) 20 Cal.3d 457, 468 [143 Cal.Rptr. 215, 573 P.2d 433]), and there would be the danger of a defendant "being convicted of an uncharged offense, or that part of the jury might think one offense proved and part think a different offense proved." (*People* v. *Gavin* (1971) 21 Cal.App.3d 408, 420 [98 Cal.Rptr. 518]; *People* v. *Creighton, supra,* 57 Cal.App.3d 314, 320.)

In *People* v. *Morris* (1906) 3 Cal.App. 1 [84 P. 463], the prosecutrix in a rape case fixed the act of rape at 4 p.m. on a particular day. The defendant offered an alibi for that time. The court held it was error not to instruct the jury to confine their consideration to the time that the prosecution evidence showed the offense had been committed. (*Id.,* at pp. 9-11.) In *People* v. *Waits* (1936) 18 Cal.App.2d 20 [62 P.2d 1054], the prosecution evidence fixed the crimes as occurring on April 7, 1936. Defendant offered an alibi for that day. The court held: "In light of appellant's alibi defense, the time the alleged offenses were committed became material, and it was the duty of the trial court to limit the jury in its consideration of the evidence to the period which the prosecution selected as the time of the commission of the offenses. [Citation.] It was, therefore, prejudicially erroneous for the trial court to instruct the jury . . . that it was wholly immaterial on what the day the offenses were committed." (*Id.,* at p. 21.)

The California Supreme Court, in *People v. Wrigley* (1968) 69 Cal.2d 149, 154-157 [70 Cal.Rptr. 116, 443 P.2d 580], specifically affirmed these cases and recognized this rule. (See also *People v. Jones* (1973) 9 Cal.3d 546, 557 [108 Cal.Rptr. 345, 510 P.2d 705].)

*Morris, Waits, Wrigley* and *Jones* can all be distinguished from the instant case simply because the defendant did not rely on an alibi defense. Appellant categorically denied all accusations.

In *Creighton,* which involved a prosecution for violation of section 288, the defendant contended that under the circumstances it was error to instruct the jury, in accordance with CALJIC No. 4.71, that "[w]hen, as in this case, it is alleged that the crime charged was committed 'on or about' a certain date, if the jury finds that a crime was committed it is not necessary that the proof show that the crime was committed on that precise date; it is sufficient if the proof shows that the crime was committed on or about that date." (*People v. Creighton, supra,* 57 Cal.App.3d 314, 318.) The Court of Appeal agreed with the defendant, noting that the instruction permitted the jury to convict the defendant without agreeing on a single, specific act as the basis for the conviction. (*Id.,* at pp. 319-320.)

The error complained of in *Creighton* did not occur here. The jury was instructed that "in order to find the defendant guilty, you must unanimously agree upon the commission of the same specific act constituting said crime within the period alleged."

The question remains whether the circumstances of this case created the danger of the appellant being convicted of an uncharged offense. (*People v. Creighton, supra,* 57 Cal.App.3d 314, 320.) Angela actually testified that the incident at Roller Towne occurred in 1980 while she lived on Clayton Street. She lived on Clayton Street between May of 1979 through July of 1980. Thus, the event at Roller Towne could have occurred at any time from January 1, 1980, through July of 1980.

A line of cases beginning with *People v. Castro* (1901) 133 Cal. 11 [65 P. 13] and *People v. Williams* (1901) 133 Cal. 165 [65 P. 323], holds that where there are multiple acts placed before a jury, each being a separate similar chargeable offense in itself, the prosecution must elect the act on which the charge will stand. In those cases, the problem was exacerbated by the failure of the court to have directed the jury that they must unanimously agree upon the commission of the same specific act constituting the crime which it was incumbent upon the state to establish by the evidence. In the instant case the prosecution elected the incident at Roller Towne and the jury was properly instructed by the trial court.

In *People* v. *Brooks* (1955) 133 Cal.App.2d 210 [283 P.2d 748], defendant was prosecuted for lewd conduct with a child and for committing acts of sexual perversion. Although the prosecution failed to fix the precise dates of offenses which occurred several months before trial and which were testified to by children who did not remember the exact calendar date, the appellate court held that no prejudicial error resulted. "If the jury believed that the offenses did happen on or about the dates charged and within the limitation period, and defendant was sufficiently apprised of the approximate dates of the offenses and was not misled in making his defense or placed in danger of being twice in jeopardy, no prejudicial error appears." (*Id.*, at p. 212.)

In *People* v. *Amy* (1950) 100 Cal.App.2d 126 [223 P.2d 69], defendant's stepdaughter, 12-years-of-age, testified that he committed lewd acts upon her about 12 times. The court held that the burden was on the People to prove that the offenses occurred within the period of limitation but they are not required to prove the date with exactness. (*Id.*, at p. 127.) The court further held that any variance was immaterial unless time is of the essence to the offense and since the defendant in that case was not misled in making his defense, did not attempt to prove an alibi as to either of the dates charged and his defense consisted of a denial of ever having committed any unlawful act upon the child, defendant was not prejudiced. (*Id.*, at p. 128.)

We find the reasoning in *People* v. *Harvath* (1969) 1 Cal.App.3d 521 [82 Cal.Rptr. 48] persuasive: " 'Contrary to defendant's assertion, there was no fatal variance between the information, which alleged that the acts complained of occurred on specific dates during the summer of 1963, and the proof which, according to the best recollection of the two children, happened sometime during their summer school vacation. The required showing that the variance prejudiced defendant's case is totally lacking.' " [Citation.] (*Id.*, at pp. 524-525.)

The reasoning and results in *Amy* and *Harvath* are applicable to this case. The prosecution made its election before the issue was presented to the jury, the trial court properly instructed on that point, and his defense was a denial of ever having committed any unlawful act on any of the alleged victims. We find that any variance between the evidence and charge in count nineteen did not prejudice appellant and we therefore affirm the conviction.

II.*

. . . . . . . . . . . . . . . . . . . . . .

*See footnote 1, *ante,* page 153.

## III. THE TRIAL COURT'S REFUSAL TO PERMIT QUESTIONING REGARDING AN ALLEGED VICTIM'S CHARACTER TRAIT FOR VINDICTIVENESS WAS NOT ERROR.[5]

 Appellant complains he was precluded from developing the topic of Rachel's character trait for vindictiveness and making false charges. The defense sought to introduce evidence that "Rachel had a character trait of vindictiveness, and that both she and Angela (and perhaps Lucienda) made false charges against people." The trial court ruled that the only character trait of the victim that the defense counsel could explore was that for honesty or veracity. As a result of that ruling, appellant complains he was precluded from questioning Rachel's mother regarding Rachel's past history of fabricating charges and her vindictive nature, and presenting evidence from Rachel's school teachers of specific instances where Rachel reacted to discipline by hostile actions. Appellant relies on *People* v. *Wall* (1979) 95 Cal.App.3d 978 [157 Cal.Rptr. 587].

 Unless precluded by statute, any evidence is admissible to attack the credibility of a witness if it will establish a fact that has a tendency in reason to disprove the truthfulness of the witness' testimony, and any evidence is admissible to support the credibility of a witness if it will establish a fact and has a tendency in reason to prove the truthfulness of the witness' testimony. (Evid. Code, § 780.) Certain evidence that would otherwise be relevant to effect credibility is made inadmissible by statutory provisions. Thus, evidence of character traits to affect the credibility of a witness is limited to the traits of honesty, veracity, or their opposites by section 786 of the Evidence Code. Section 787 of the Evidence Code makes inadmissible evidence of specific instances of bad or good conduct, with the exception of a felony conviction, to prove a witness' character trait to attack or support the credibility of the witness.

In *People* v. *Wall, supra,* 95 Cal.App.3d 978, a prosecution for forcible rape, the First District Court of Appeal held it was reversible error for the trial court to strike the testimony of a defense witness that the victim had threatened to make a false accusation of rape against him and to instruct the jury to disregard such testimony. The appellate court held the evidence was admissible under Evidence Code section 1103, subdivision (1), a special statute, apposite by its terms only to a criminal action, which authorized evidence of a trait of character in the form of specific instances of conduct of the victim of the crime for which the defendant was being prosecuted. The appellate court determined the lower court erred in excluding it under

---

[5]See footnote 1.

Evidence Code section 787, described as a general statute purporting to apply to civil and criminal cases alike.

 The *Wall* case incorrectly interprets the various Evidence Code sections. Evidence that the victim would falsely accuse someone other than defendant of rape, establishes her character trait of threatening to make false allegations of rape, but such evidence is made inadmissible to attack her credibility by Evidence Code section 787.[6] Evidence Code section 786 limits evidence of character traits to attack the credibility of a witness to the character traits of dishonesty or untruthfulness. While her threat of false accusations of rape would relate to the character traits of untruthfulness, section 787 of the Evidence Code provides that specific instances of conduct relevant only to prove a character trait are inadmissible to attack a witness' credibility.

The *Wall* court held the evidence admissible pursuant to Evidence Code section 1103, subdivision (1)(a).[7] The Law Revision Commission's comment to Evidence Code section 1101 points out that Evidence Code section 1101 is not intended to refer to character-trait evidence offered to prove a fact relating to credibility of a witness. (See Evid. Code, § 1101, subd. (c).) The note specifically states that the admissibility of such evidence is determined under Evidence Code sections 786 to 790. (See 2 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 28.1, p. 847.)

 Evidence Code section 786 provides that evidence relating to the character of a witness for the purpose of affecting his credibility is limited to the character traits of dishonesty and untruthfulness to attack credibility and to the opposite character traits of honesty and truthfulness to support the witness' credibility. These are the character traits which necessarily are involved in properly determining credibility. Other character traits are not sufficiently probative of a witness' honesty or truthfulness to warrant consideration on the issue of credibility. (*People* v. *Thompson* (1979) 98 Cal.App.3d 467, 475 [159 Cal.Rptr. 615].)

 Defense counsel attempted to place before the jury specific instances of Rachel's conduct as proof of a character trait of vindictiveness

---

[6]Section 787 of the Evidence Code provides: "Subject to Section 788, evidence of specific instances of his conduct relevant only as tending to prove a trait of his character is inadmissible to attack or support the credibility of a witness."

[7]Prior to the 1981 amendment, Evidence Code section 1103, subdivision (1) read as follows: "(1) In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by section 1101 if such evidence is: (a) Offered by the defendant to prove conduct of the victim in conformity with such character or trait of character. . . ."

which would tend to disprove the truthfulness of her testimony at trial. The trial court properly excluded this line of questioning.

In any event, evidence was admitted as to Rachel's general reputation for dishonesty. Her mother testified that Rachel was not always honest. Her mother also testified that Rachel informed her that Rachel was raped behind the school backstop. The school principal, James Rhodes, testified Rachel had a reputation for dishonesty and that Rachel never mentioned to him the rape on campus which she claimed to have reported to him. Dolores S., Donna H. and Brenda C. each testified regarding Rachel's lack of honesty. Although Rachel's reputation for honesty or veracity had been seriously impugned, the jury accepted her version of the facts as to all counts in which she was the alleged victim. Therefore, assuming for the purpose of argument that it was error to exclude the evidence of her alleged vindictive character, it was harmless error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

Appellant also claims that the defense sought to introduce evidence that "Angela (and perhaps Lucienda) made false charges against people." This contention is not supported by the record. Defense counsel never made an offer of proof, nor was there any indication of an attempt to prove that Lucienda made false charges against other persons. As to Angela, counsel offered to prove that Angela was having sex with her mother's boyfriend in an effort to establish that Angela was being threatened by someone other than the appellant. The record fails to disclose that defense counsel attempted to offer evidence that Angela had falsely accused persons other than the appellant. In fact, defense counsel expressly chose not to pursue it.

In conclusion, we hold the trial court did not err in excluding evidence of the victims' alleged character trait of vindictiveness.

IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

V. The Sentencing Court Properly Imposed the Aggravated Term on All of the Forcible Rape Counts.

At sentencing, the lower court indicated that section 667.6 subdivision (d) mandated consecutive aggravated terms for each count on which a conviction was entered for violating section 261, subdivision 3.

---

*See footnote 1, *ante,* page 153.

The court proceeded to sentence appellant to state prison for the term prescribed by law for the predeterminative sentencing law offense in count five and then sentenced appellant to consecutive aggravated terms in state prison for the remaining section 261, subdivision 3 convictions, i.e., counts one, eleven, thirteen, fourteen, sixteen, and eighteen.

Although the court imposed the upper term for each of the foregoing offenses with the exception of the offense charged in the fifth count of the information because the court felt that it was mandated to do so by the provisions of section 667.6, subdivision (d), the court then noted that even if it was not mandated to do so, the court felt that the circumstances in aggravation were such that the imposition of the upper term was appropriate. Those enumerated factors in aggravation were that (1) all of the victims of these crimes were young females; (2) they were extremely vulnerable as they were the defendant's stepdaughters or the friends of his stepdaughters; (3) the number and nature of the offenses occurring over a four-year period made it clear to the court that the crimes were carried out by this defendant in a premeditated, deliberate, and willful manner; and (4) that appellant had established an ongoing, continuing pattern of violent conduct that constituted an extreme danger to the community.

 Appellant contends that section 667.6, subdivision (d) does not require imposition of consecutive aggravated terms but simply makes the term otherwise determined under applicable sentencing laws fully consecutive, obviating the need to fractionalize the subordinate terms.

 Furthermore, appellant contends that because the sentencing judge in this case was not the trial judge, the alleged error in statutory construction could not be cured by the lower court's explanation that it would have imposed the aggravated sentence even if he had not felt compelled to do so by statute. This is made manifest, according to appellant, because of one of the factors in aggravation, i.e., a pattern of violent conduct, is unsupported by the record.

Appellant submits that the sentencing was improper and that the matter be remanded for resentencing under the appropriate statutory standard.

Section 667.6, subdivision (d) provides as follows: "A full, separate, and consecutive term shall be served for each violation of subdivision (2) or (3) of Section 261 . . . if such crimes involve separate victims or involve the same victim on separate occasions.

"Such term shall be served consecutively to any other term of imprisonment, and shall commence from the time such person would otherwise have

been released from imprisonment. Such term shall not be included in any determination pursuant to Section 1170.1. Any other term imposed subsequent to such term shall not be merged therein but shall commence at the time such person would otherwise have been released from prison."

Section 667.6 was enacted as part of a legislative package which dealt with violent sexual offenses. (Stats. 1979, ch. 944, § 10, p. 3258.) Effective January 1, 1980, the Legislature amended the Penal Code to increase dramatically the prison term for a person convicted of violent sex offenses. (*People* v. *Karsai* (1982) 131 Cal.App.3d 224, 236-242 [182 Cal.Rptr. 406].)

In construing section 667.6, subdivision (d), we must examine the text of the statute and the sentencing rules together with the intent of the Legislature so the interpretation will effectuate the purpose of the law. (*People* v. *Caudillo, supra,* 21 Cal.3d 562, 576.)

The basic rule of statutory interpretation is that courts should avoid a construction which renders a part of a statute "surplusage." (*People* v. *Gilbert* (1969) 1 Cal.3d 475, 480 [82 Cal.Rptr. 724, 462 P.2d 580].) Thus, we must consider the legislative intent in using the phrase "[a] *full, separate, and consecutive term . . .*" in section 667.6, subdivision (d).

The sentencing court interpreted the phrase to not only prevent a section 667.6, subdivision (d) offense from being categorized as a subordinate term but also to automatically require imposition of the upper term without consideration of circumstances in aggravation.

The term "full" is defined as "containing all that possibly can be placed or put within [a container]." (Webster's Third New Internat. Dict. (1961) pp. 918-919.) This definition of the term is consistent with the trial court's application of this section as well as the legislative mandate of punishing sex offenders more severely.

However, when the statutory language in the Penal Code is reasonably susceptible of two constructions, courts are required to adopt that construction which is more favorable to the offender. (*People* v. *Collins* (1983) 143 Cal.App.3d 742, 745 [192 Cal.Rptr. 101], hg. den. Aug. 18, 1983.) " 'The defendant is entitled to the benefit of every reasonable doubt, whether it arise out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute.' " (*People* v. *Davis* (1981) 29 Cal.3d 814, 828 [176 Cal.Rptr. 521, 633 P.2d 186] quoting *In Re Tartar* (1959) 52 Cal.2d 250, 256-257 [339 P.2d 553].)

When the Legislature decided a system of determinate sentences was preferable to indeterminate sentences (Stats. 1976, ch. 1139, § 273), it directed the Judicial Council to "promote uniformity" in sentencing by adopting rules providing criteria to assist trial judges in either granting or denying probation, in selecting appropriate prison terms and in deciding how such terms should be served. (§ 1170.3, subds. (a)(1)-(a)(5).) The sentencing rules adopted apply to all criminal cases in superior court where the defendant is convicted of one or more offenses punishable as a felony by a determinate sentence under California Rules of Court, rule 403, sections 1170 through 1170.8. California Rules of Court, rule 403, section 1170.1, subdivision (a) defines the aggregate term of imprisonment for all such felony convictions as ". . . the sum of the principal term, the subordinate term and any *additional* term imposed pursuant to section 667.5, 667.6, or 12022.1." [Italics added.] ▇▇▇ Thus, a section 667.6 offense is an "additional term" under California Rules of Court, rule 403, section 1170.1, subdivision (a) and therefore within the express purview of California Rules of Court, rule 403. It then follows that while any sentence imposed under section 667.6 must be a full force term unlike the subordinate term of California Rules of Court, rule 403, section 1170.1, subdivision (a) which requires a two-thirds reduction in the middle term of imprisonment prescribed for any such felony conviction, it is still required to state the reasons for imposing an upper term rather than a midterm pursuant to the sentencing rules for the superior court. (Cal. Rules of Court, rules 401-453.) Under this analysis, the language of section 667.6, subdivision (d) does not mandate the imposition of the aggravated term but, rather, a full consecutive term (*People* v. *Nash* (1982) 129 Cal.App.3d 513, 519 [181 Cal.Rptr. 145]; *People* v. *Preciado* (1981) 116 Cal.App.3d 409, 412 [172 Cal.Rptr. 107]) and prevents a section 667.6, subdivision (d) offense from being categorized as a subordinate term.

▇▇▇ This conclusion does not necessitate a remand for resentencing. The sentencing court in this case stated "for the record" that even if it was not mandated to do so, the court felt that the circumstances in aggravation were such that the imposition of the upper term was appropriate. The court listed the circumstances in aggravation as follows: "Those factors in aggravation are that all of the victims of these crimes were young females. They were extremely vulnerable. They were the defendant's stepdaughters or the friends of his stepdaughters.

"Furthermore, the number and nature of the offenses occurring over a four-year period make it very clear to the Court that the crimes were carried out by this defendant premeditatedly, deliberately, willfully. There is no question about it. It is also the opinion of this Court based upon the offenses for which he is convicted that he has established an ongoing, continuing

pattern of violent conduct that constitutes an extreme danger to the community.

"Those factors far outweigh any factors in mitigation such as his freedom from any prior felony convictions."

The court thus imposed a sentence authorized by law.

Appellant's complaint that the alternative method of sentencing provided by the sentencing court is somehow deficient in this case because the sentencing judge was not the trial judge and had not heard the testimony, is without merit. The court had access to and declared he had read a substantial portion of the trial transcript. Additionally, defense counsel below argued that she thought the facts at trial did not show violent conduct by appellant. The court was aware of the argument and properly rejected it. Multiple instances of forcible rape of minor children by threat, frequently involving striking or hitting the victims and verbal threats to induce submission certainly constitute "violence" within the meaning of California Rules of Court, rule 421 (b)(1). Appellant had engaged in a pattern of violent conduct which indicated he was a serious danger to society. (Cal. Rules of Court, rule 421 (b)(1).)

Affirmed.

HANSON (P. D.), Acting P. J. ██ ██ ██ 
██ ██ ██ ██ ██ ██ ██ I concur.

The circumstances presented by this case are very different from the facts of the published cases involving violations of former section 261, subdivision 3 of the Penal Code,[1] amended in 1980. Of course it is not the purpose of this court to substitute a "sociological essay" for a legal opinion, and the majority opinion has not done so contrary to the dissent's import, but it is necessary to consider the totality of the circumstances involved and apply the appropriate legal standard; "each case must be resolved on all of the circumstances present." (*People* v. *Hunt* (1977) 72 Cal.App.3d 190, 194 [139 Cal.Rptr. 675].) We also recognize that "[t]he prevailing rule in California is that threats may be inferred from conduct." (*People* v. *Hunt, supra,* 72 Cal.App.3d 190, 194.) Only someone wearing blinders could read the record and not recognize the uniqueness of the situation presented.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

These youngsters (with the possible exception of Angela S.) were continually intimidated and sexually victimized by the most powerful figure in their lives beginning at a young and completely helpless age. Only after six, seven and nine years of constant abuse, when they had reached adolescence, could these children muster the fortitude and courage to take a stand against the tyranny of their nemesis.

The reliance by the dissent on *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], is misplaced. As stated in the present majority opinion at page 11, a rape by means of threat of great bodily harm is not synonymous with rape by force or violence. (*Id.,* at p. 583.) In the latter, as in *Caudillo,* the court must focus on whether the injury actually inflicted rises to the level of *great* bodily harm. In cases such as the one presently before us, the question is whether the appellant's conduct, under the circumstances, implies a *threat* of great bodily harm to the victim. (*People* v. *St. Andrew* (1980) 101 Cal.App.3d 450, 466 [161 Cal.Rptr. 634].)

As the jury, who observed the demeanor of the witnesses and appellant, found here that the various crimes involved threats of great bodily injury, the jury obviously concluded the victims believed they would be seriously harmed.

The dissent makes light of appellant's own testimony to the effect that whenever he disciplined the children he used "switches" pulled from a tree in the yard (see *People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771]), and testimony by both Rachel and Angela that they feared appellant would use a gun on them.[2] We are not discussing corporeal punishment administered by a caring parental figure. This is a rape case in which corporeal punishment and threats (expressed and implied) are used for the purpose of sexually exploiting young children. While the record is void of testimony regarding resulting bruises, lacerations, or actual bodily injury, as neither defense counsel nor the prosecution sought to elicit any such testimony, it was within the province of the jury to determine that the "whippings," "slaps," and "hits" the children received at the hands of appellant in the past would be remembered on the occasions complained of herein when appellant threatened to "get" them, and that this conduct when considered in light of the totality of the circumstances constituted threat of great bodily harm. (See *People* v. *Brown* (1971) 14 Cal.App.3d 334, 346-347 [92 Cal.Rptr. 370]; see also *People* v. *Reyes* (1984) 153 Cal.App.3d 803, 810-811 [200 Cal.Rptr. 651].)[3]

---

[2]Rachel testified appellant possessed a gun and she was afraid of it. Appellant had threatened to kill her with it while she slept if she ever told of their sexual relationship. Angela testified of her fear of appellant, including her fear that he would pull a gun on her.

[3]It is interesting to note that the author of the dissenting opinion in this case concurred in the *Reyes* opinion.

We cannot say as the dissent urges that as a matter of law the Legislature intended before the 1980 amendment that on facts such as these a properly instructed jury could not find that appellant accomplished his sexual assaults by conduct inferring threats of great bodily harm.

The record clearly demonstrates that the minor victims are exceedingly inarticulate; even so, they managed to set forth the peculiar and tragic set of circumstances which surrounded their lives for years. It is the children's utter vulnerability, the perpetrator's total control and domination over them, and the duration of the victimization, which together with appellant's acts permitted the jury, fully and properly instructed, to determine the evidence was sufficient to establish that these children were prevented from resisting the sexual assaults by appellant's threat of great bodily harm. (*Ibid.*; *People v. Hunt, supra,* 72 Cal.App.3d 190, 198.) It is not the function of this court to reweigh the evidence. (*People* v. *Samuel* (1981) 29 Cal.3d 489, 505 [174 Cal.Rptr. 684, 629 P.2d 485].)

For these reasons, I concur in the judgment.

We also note the dissent appears preoccupied with the length of the sentence imposed upon appellant. This concern is inappropriate when discussing the issue of sufficiency of evidence. Furthermore, this apparent anguish is most intriguing in light of the dissenting justice's recent opinion in *People* v. *Price* (1984) 151 Cal.App.3d 803 [199 Cal.Rptr. 99] in which he stated on page 822: "Too often in the past (and perhaps continuing in some areas to the present day) sexual assaults against women were treated by a male-dominated society as relatively minor offenses, permitting violent criminals and heinous conduct to go unpunished or lightly punished. The sentencing provisions of section 1170.1, subdivision (i), section 667.6, and section 12022.3 appear intended to rectify this disparity of treatment of sexually assaultive criminals, and for that reason care must be taken not to dilute their effect with a misguided reluctance to impose their extreme punishments. A sentence should not be so lenient as to depreciate the gravity of the offense." While we recognize *Price* and *Reyes* are not authority for the holding in this case, the contradictory nature of the attitudes expressed by the author of the dissent in these opinions is certainly curious.

**ANDREEN, J.,** Dissenting and Concurring.—I respectfully dissent from that portion of the majority opinion which discusses counts one, three, five, nine and thirteen.

The present case is a difficult one, because the horror of child abuse, chronicled by the majority in what is essentially a sociological essay, overcomes reason with outrage at the despicable acts committed by the defend-

ant. No matter how justified the desire that defendant suffer a punishment commensurate with his repugnant conduct, however, we must not become so result-oriented that we abandon all distinctions among penal statutes in support of an overzealous prosecutor's efforts to obtain the maximum possible period of incarceration.

In counts one, three, five, nine and thirteen, defendant was convicted of rape where the victims' lack of consent was overcome by "threats of great and immediate bodily harm." Yet in each of these instances, as testified to by the victims and recounted by the majority, the victim either feared being spanked or was hit or slapped unaccompanied by other threatening words or conduct. There was sufficient evidence under the substantial evidence test to establish that defendant committed some sexual crimes, but not the violent sexual offenses charged by the prosecution in an apparent (and successful) attempt to invoke the severe sentencing provisions of Penal Code[1] section 667.6 which contributed to the defendant's commitment to state prison for 57 years and 4 months.

No reported case has focused on the quality of the words or conduct necessary to constitute threats of *great bodily harm* as used in the former statute under which defendant was prosecuted.[2] As pointed out by the majority, decisional law has established a subjective/objective analysis including consideration of the relative statuses of the perpetrator and victim with regard to physical attributes and circumstances. Yet none of these cases discussed the significance of the term "great bodily harm" as it bears upon the nature and quality of the threats, if any, made by the perpetrator. Our Supreme Court has undertaken at length an exegesis of the term "great bodily injury," in *People* v. *Caudillo* (1978) 21 Cal.3d 562 [146 Cal.Rptr. 859, 580 P.2d 274], refined in *People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520], but except for one throwaway sentence noting that *Caudillo* did not construe the precise statute at issue, the majority makes no attempt to explain why an authoritative interpretation of almost identical statutory language ("great bodily injury" instead of "great bodily harm") should not control the present case.

---

[1] All further statutory references are to the Penal Code, unless otherwise indicated.

[2] In 1980, the language requiring threats of great bodily harm was deleted from the statute, and rape by threat was combined with rape by force into a single provision: "Rape is an act of sexual intercourse accomplished with a person not the spouse of the perpetrator, under any of the following circumstances: . . . [¶] 2. Where it is accomplished against a person's will by means of force or fear of immediate and unlawful bodily injury on the person o[f] another." (§ 261, subd. (2), as amended by Stats. 1980, ch. 587, § 1, p. 1595.) Note that great bodily harm is no longer an element of the threat required; fear of unlawful bodily injury is now sufficient to invoke the statute. All of defendant's alleged conduct occurred prior to the effective date of the 1980 amendments.

In *Caudillo, supra,* the Supreme Court held that the term "great bodily injury" as used in an enhancement provision of a burglary statute meant an injury that constituted " 'a significant or substantial *physical* injury.' " (*Id.,* at p. 581.) The extreme discomfort associated with the violations inherent in rape, oral copulation and sodomy, including ancillary effects such as vomiting and diarrhea, were held to constitute "bodily harm," a lesser form of injury not within the purview of *"great* bodily injury." (*Id.,* at pp. 582-583, 585, 587-588, italics added.) The high court specifically rejected an interpretation which would have equated "bodily harm" with "great bodily injury." (See *id.,* at p. 580.)

In *People* v. *Wolcott, supra,* 34 Cal.3d 92, the Supreme Court retreated marginally from the strong language of *Caudillo* in a situation where a jury which had convicted the defendant of robbery also found that he had inflicted "great bodily injury" within the meaning of section 12022.7. (*Id.,* at pp. 96, 106.) During a struggle with the victim over the pistol used in the robbery, the defendant eventually gained control of the weapon and then shot the victim in the leg, with bullet fragments from this wound entering the victim's arm in six or seven places. (*Id.,* at p. 107.) In the course of holding that the victim's injuries supported the jury's finding of great bodily injury, the Supreme Court discussed with apparent approval other cases in which (1) genital tearing, trauma and pain, (2) multiple abrasions and lacerations, (3) bruising and swelling of hands, arms and buttocks, and (4) a broken nose, a knocked out tooth, and cuts requiring sutures were all held to have been great bodily injury. (*Id.,* at pp. 107-109.)

In the present case, the two witnesses who testified as to threats other than those made after the sexual offenses had occurred[3] (the latter intended to insure the victims' silence, not coerce them into cooperation) both stated

---

[3]As pointed out by the concurring opinion, Rachel testified that defendant kept a gun in a suitcase in his room, that she was frightened by the gun, and that defendant had threatened her with the gun "[a] couple of times." When the prosecutor asked if the gun threats had anything to do with sex, Rachel answered, "Yes, he told me if I tell, he would kill us in our sleep." (Angela's sole mention of a gun came in response to prosecution questions about why she did not leave a house where defendant had allegedly taken her in order to engage in sex: "I don't know what the man might do. He probably pull a gun on me or something, hm-mm.")

Threats made after a sexual attack designed to coerce the victim's silence cannot form a basis for finding that the attack was made under threat of great bodily harm. I recognize that the concurring opinion adds these transitory references to a gun into what it views as the totality of circumstances constituting implied threatening conduct. However, there must come a point at which every aspect of a defendant's existence is not grist for a jury's finding of implied threat. Defendant undoubtedly had access to kitchen knives or could have run over his victims with his van, but the mere potentiality of these instruments does not convert defendant's postattack threats into assaults with deadly weapons. I therefore do not regard the brief mention of a gun in Rachel's or Angela's (who was not a victim in the disputed convictions) testimony as determinative.

that they interpreted defendant's words as portending a "whipping" if they did not comply with his wishes. On other occasions, the defendant actually hit or slapped the victims, and/or physically forced himself upon them. In each of these latter instances, there is an evident violation of former section 261, subdivision (2), which at the time of defendant's conduct prohibited rape accomplished by means of "force or violence." However, the prosecutor did not charge violation of subdivision (2), except in two counts (11 and 13), one of which was dismissed and one of which was amended to charge subdivision (3). Thus, the prosecution presented the jury with a choice of convicting defendant of rape by threat of great bodily harm, convicting him of statutory rape, or acquitting him.[4] Since the defendant's use of *force* was frequently described in the witnesses' testimony relating to both charged and uncharged incidents of sexual abuse, it is not surprising that the jury convicted the defendant of rape by threat in nine of the twelve counts in which rape by threat was charged. It being evident that the victims had not consented to the sexual intercourse, the only alternative to a conviction of section 261.5 which did not involve complete acquittal was a conviction for violation of section 261, subdivision (3).

Apparently recognizing that the threatened "whippings" in counts one and nine did not rise to the level of great bodily harm, and conceding the absence of threatening behavior in counts three, five and thirteen, the majority embarks upon the most novel and disturbing portion of its opinion. Relying upon various works examining the elements and effects of sexual abuse of children, the majority concludes that "early and repeated threatened and actual *punishment*" (italics added) by defendant "conditioned" the victims to submit to defendant's sexual abuse and somehow converted their fear of a "whipping" into fear of "great bodily harm." (Majority opn., *ante,* at p. 173.) As to the counts where no threatening behavior or words were present—counts three, five and thirteen—this prior "conditioning" through "punishment" substitutes completely for actual fear of great bodily harm! Although none of the victims in the five counts at issue had ever been coerced into cooperation by threats of great bodily harm, and even though, as to three of the counts, *no threats were made at all,* defendant's conduct from years past, none of which was charged or proven, is relied upon by the majority to support his conviction of a statutorily defined crime expressly requiring threats of great bodily harm, so that the five convictions could be used to impose a prison commitment of over twenty-five years.[5]

---

[4] As to four of the incidents, defendant was charged with oral copulation in addition to sexual intercourse. The jury found him not guilty of each oral copulation charge.

[5] The record on appeal is hopelessly contradictory with regard to the sentences imposed upon defendant for the various convictions. At the hearing on the report of the probation officer and judgment held on January 7, 1982, the reporter's transcript indicates that the sentencing court imposed aggravated, eight-year terms for the first, "eleventh," thirteenth,

The courts have rightfully abandoned the "'primitive rule that there must be resistance to the utmost'" in cases of forcible rape. (*People* v. *Cassandras* (1948) 83 Cal.App.2d 272, 278 [188 P.2d 546].) I recognize that the cases have given great latitude to the jury's finding that implied threats were sufficient to violate the statute at issue in this case. Even so, the cases cited by the majority do not support the total abandonment of reference to the "great bodily harm" standard of former section 261, subdivision (3). In *People* v. *Cassandras, supra,* the victim was told "'to keep still if [she] didn't want to get hurt,'" and she testified that she was frightened of being "'hurt.'" (*Id.,* 83 Cal.App.2d at p. 278.) Where the rapist leaves it to the victim's imagination what he will do if she resists, and she actually fears some serious injury, it is understandable, faced with the alternative of permitting the defendant's conduct to go unpunished, that the appellate court would uphold a factual finding that the threat was of "great and immediate bodily harm." In *People* v. *La Salle* (1980) 103 Cal.App.3d 139 [162 Cal.Rptr. 816], which relied upon *Cassandras,* the victim was coerced at least in part by the rapist's seizure of the victim's two- and one-half-year-old daughter, and the victim again testified that she was afraid that the defendant would hurt her, preventing her from returning to her daughter, whom the defendant had forced from the car. (*Id.,* at pp. 143-144, 147.) "[B]ecause of defendant's tone of voice, the way he spoke to [the victim], and the way he treated her daughter, [the victim] was afraid he would harm [the daughter] if [the victim] did not accede to his demands." (*Id.,* at p. 147.) Leaving a two- and one-half-year-old child unattended on a city street is tantamount to placing the child in danger of great bodily harm, and again, a determination that no sufficient threats occurred would have meant that the defendant's unquestionably coercive rape would go unpunished.

---

fourteenth, sixteenth and eighteenth counts, plus a four-year term (thirty-two months of which was stayed) for the third count, for a total of fifty-seven years, four months. The eleventh count of the information had been dismissed, however, and the court failed to state what term it was imposing for counts nine and twelve. Thereafter, the court recited that, "It is the further judgment of this Court and it is hereby ordered that the aggregate term of imprisonment imposed for the offenses charged in Counts 1, 3, *9, 12,* 13, 14, 16, and 18 of the Information shall run consecutively to and commence upon completion of the terms of imprisonment imposed for the offenses charged in the fifth count of the Information . . .," (italics added) thus omitting its previous reference to an "eleventh" count and referring to the missing counts nine and twelve. The abstract of judgment-commitment and minute order for the sentencing hearing make further modifications to the sentence: count nine, which the trial court failed to mention except in its recitation of consecutive terms, is listed as having a two-year term. Counts seven, eight and nineteen, all unlawful sexual intercourse convictions for which the trial court had imposed two-year terms which if then stayed, were listed by the abstract and minute order as having been imposed fully consecutively. Thus, although in error as to four of the convictions, the abstract still totaled fifty-seven years, four months, having subtracted six years from count nine and added six years for counts seven, eight and nineteen. It is apparent that the trial court intended to sentence defendant to the maximum possible term for the violent sex offenses, so it is reasonable to assume that it intended to impose eight-year sentences on counts nine and twelve.

In both *People* v. *Hunt* (1977) 72 Cal.App.3d 190 [139 Cal.Rptr. 675], and *People* v. *St. Andrew* (1980) 101 Cal.App.3d 450 [161 Cal.Rptr. 634], the defendants' convictions for rape by threat were reversed. In *St. Andrew,* the appellate court reversed in what it described as a "close" case, because the prosecution had improperly introduced and emphasized in argument evidence of the defendant's prior misconduct. (*Id.,* at pp. 464-465.) For guidance on retrial, the court assessed the nature of the alleged threatening conduct: the defendant had made no overtly threatening words or gestures, but the victim, who was a patient in the psychiatric ward of the hospital where the defendant was an attendant, testified that she was afraid that the defendant would strike her or smother her, or that he would isolate her in a locked room. (*Id.,* at p. 454.) Recognizing that the victim's fears may have been entirely subjective, the court held that the jury should be given, on retrial, much more detailed instructions as to the nature of threat required to violate the rape statute. (*Id.,* at pp. 465-466.) It further held that if the defendant was aware of the victim's objectively unreasonable but subjectively real fear of great bodily harm, and took advantage of this knowledge to coerce a sex act, then he would be guilty of rape by threat. (*Ibid.*) The difference from the present case is evident—the victims here testified that they did not have a subjective fear of great bodily harm; they feared at most a spanking.

In *People* v. *Hunt, supra,* 72 Cal.App.3d 190, the appellate court had even greater doubts about the threatening nature of the defendant's conduct. "Defendant did not use physical force to overpower a resisting female. Neither did he expressly utter any threats to inflict great bodily harm to the victim. It must be pointed out that, according to the *victim's* testimony, except for defendant's placing her hand on his privates and embracing her with his arm, the suggestions of engaging in sexual relations came from her. It was she who first mentioned going to a motel and it was she who initiated the proposal that she orally copulate the defendant. This undoubtedly explains the jury's verdict of acquittal on the charge of forcible copulation.

"The People's theory is that the acts of sexual intercourse, however, were the result of threats which could be implied from the circumstances. Central to that theory is the factor of the victim being inside a moving vehicle which was under the control of the defendant.

" . . . . . . . . . . . . . . . . . . . . .

"[D]efendant and victim met in broad daylight when victim was picked up at her solicitation by defendant driving a camper at 1:20 p.m. to traverse a distance which normally would take 40 minutes but was not delivered to

her destination until 2 hours later, and all the time was spent on the freeways and highways in a busy area except for an approximate 30 minutes spent at a secluded spot; she saw pornographic pictures on the dashboard of the camper immediately after she seated herself; defendant told her he was a pornographic photographer; except for suggesting a motel as an alternative to using the camper, she never clearly articulated any lack of consent; she did not take the license number of the vehicle and she wrote out and handed to him her correct name, address and telephone number before she left. . . .

"Although we conclude that under the usual test on appeal the evidence was legally sufficient to support the conviction . . . [citing *People* v. *Cassandras, supra*] we hasten to observe that the case is a very close one indeed." (*People* v. *Hunt, supra,* 72 Cal.App.3d at pp. 198-199.) Because the evidence was so close, the conviction was reversed for instructional error permitting the jury to consider "other crimes" evidence as substantive evidence of the defendant's guilt. (*Id.,* at pp. 203-204.)

The concurring opinion makes much of the fact that defendant testified that when he disciplined the children, he used a "switch" pulled from a tree in the back yard to "swat" them, suggesting that such evidence supports a finding of threat of great bodily harm pursuant to *People* v. *Jaramillo* (1979) 98 Cal.App.3d 830 [159 Cal.Rptr. 771]. This illustrates well the extent to which the majority and concurring opinions would warp interpretation of the statute at issue, equating threat of great bodily harm with *any* application of force or fear. In *Jaramillo,* a child abuse case not involving sexual conduct, the defendant "disciplined" her young daughter by striking her forcefully and repeatedly with a wooden stick 18 to 20 inches long and 1 inch in diameter. (*Id.,* at pp. 833-834.) The daughter suffered (in the words of the Court of Appeal), "multiple contusions over various portions of her body and the injuries caused swelling and left severe discoloration on parts of her body. The injuries were visible the day after infliction to at least two lay persons . . . . Further, there was evidence that [the victim] suffered pain as a result of her injuries because a day later she had a 'look of anguish' on her face and she flinched or turned away from a simple guiding touch on the shoulder . . . and [the victim said] that 'it hurt' . . . ." (*Id.,* at p. 836.) The appellate court went on to observe: "A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description. Clearly it is the trier of fact that must *in most situations* make the determination. Here, *while the issue might be close* it appears that there were sufficient facts upon which the court could base its finding of great bodily injury and such a finding therefore will not be disturbed on appeal." (*Ibid.,* italics added.) The stick used by the defendant to strike her child was found to be a deadly weapon within the meaning of Penal Code section 12022, subdivision (b). (*Id.,* at p. 837.)

*Jaramillo,* approved in *People* v. *Wolcott, supra,* 34 Cal.3d at pages 107, 108, can only be taken as the extreme lower limit of the characterization "great bodily injury," involving as it did bruises and swelling apparent one day after infliction. In the present case, Lisa testified that defendant would hit or slap her with his hand, or would make her stay in the house for a week if she resisted him, Lucienda stated that defendant hit her *on one occasion*—his first assault when she was six years old—with his open hand, and Rachel testified that defendant would hit her with his hand or make up some excuse so that he could discipline her a few days later. The majority and concurring opinions apparently hold that hitting or slapping with the open hand or swatting with a switch resulting in no nontransitory effects such as swelling or bruising is the equivalent of an attack with a deadly weapon, simply because the victims were so young. Yet the victim in *Jaramillo,* relied upon by the concurring opinion as supporting the majority, was also six years old when attacked with a deadly weapon. By the majority's standard, any parent who used corporal punishment of any sort on a six year or older child (Lisa testified that she was nine years old when first attacked by defendant) would be guilty, if a jury so found, of inflicting great bodily injury upon the child.

Neither *People* v. *Reyes* (1984) 153 Cal.App.3d 803 [200 Cal.Rptr. 651], nor *People* v. *Price* (1984) 151 Cal.App.3d 803 [199 Cal.Rptr. 99], cited by the concurring opinion as somehow inconsistent with this dissent, support the complete abandonment of the distinction between great bodily injury and simple bodily harm accomplished by the majority and concurring opinions. In *Reyes,* we concluded that threats of force made to a young child were sufficient to create "fear of immediate and unlawful *bodily injury*" within the meaning of a statute specifically designed to punish lewd conduct with children. (*People* v. *Reyes, supra,* at pp. 808, 809-811.) Nothing could illustrate more effectively the concurring opinion's misconception of the legal standard to be applied to the present case than the fact that it regards *Reyes,* involving threat of simple bodily injury, as authority for construing a statute requiring threats of *great* bodily injury.

In *People* v. *Price, supra,* involving multiple sexual assaults upon an adult female in violation of statutes prohibiting rape, sodomy and oral copulation by *force* (with which defendant should have been charged in the present case), we noted that courts should not shun the draconian penalties appropriate to such crimes *merely because they are draconian.* (*Price, supra,* 151 Cal.App.3d at p. 822.) Only one of the four sexual assaults in that case was challenged for sufficiency of evidence, and the defendant concededly used a knife and a broken bottle in committing the vicious and calculatedly humiliating attacks upon the victim. The concurring opinion applies the Legislature's unmistakable condemnation of violent sexual assaults embodied in

section 667.6, subdivisions (c) and (d) to uphold an improperly arrived at conviction—surely something even the most fervent advocate of lengthy sentences would abjure and undisputably prohibited by our constitutional guarantees of substantive and procedural due process. There is nothing contradictory in requiring that the prosecution comport with the protections of a democratic system of justice in convicting a defendant, while still being willing to follow the mandate of the Legislature after that defendant has been *validly* convicted.

Appellate justices are not logic machines; within the strictures of reason and jurisprudence, they strive to do substantial justice, punishing criminal conduct when it is reasonable to do so, as in *Cassandras, supra,* and *La Salle, supra,* but recognizing that even the "guilty" must be proven so according to the standards of procedural and substantive fairness which wisdom, experience and democratic ideals have laboriously built into our administration of justice. As I have repeatedly acknowledged, the conduct of the defendant in the present case was despicable and unforgivable. The prosecutor, perhaps understandably, fashioned her charging allegations to bring the ultimate convictions within the operation of penal statutes harking back to the extreme retributions of previous centuries. Defendant deserves to be punished, but if he is to spend the remainder of his life in prison,[6] it should not be as the result of manipulation of a criminal statute inapplicable to his conduct.

For the above reasons, I cannot accept the majority's unprecedented theory of constructive threats of great bodily harm arising from past, uncharged conduct falling short of the level of threatening conduct proscribed by the statute. My "preoccupation" with the length of the sentence imposed below arises from a desire that this court not approve what is effectively a life term for convictions achieved via legal subterfuge. It is not inappropriate to gauge one's concern over the magnitude of an injustice by assessing the effect it will have upon the life of the person whose rights are violated. The concurring opinion justifies derogation of defendant's right to procedural and substantive fairness by the magnitude of the wrong done to his victims—the latter a consideration appropriate only when accompanied by careful attention to the strictures of due process. I would reverse the convictions as to counts one, three, five, nine, and thirteen.

---

[6]At the time of trial, defendant was 48 years old; he was sentenced to 57-plus years in prison. Given maximum behavioral credits, defendant can expect to be released on parole when he is approximately 76 years old, if he is still alive.

As to counts twelve, fourteen, sixteen and eighteen, which account for 32 years of defendant's total sentence, and counts seven, eight and nineteen, as to which the sentences were stayed (see fn. 5, *ante*), I concur with the majority.

A petition for a rehearing was denied May 23, 1984. Andreen, J., was of the opinion that the petition should be granted. Appellant's petition for a hearing by the Supreme Court was denied July 26, 1984. Kaus, J., was of the opinion that the petition should be granted.